367 So.2d 1161 (1979)
HAUGHTON ELEVATOR DIVISION, Reliance Electric Corp., Plaintiff-Appellant-Relator,
v.
STATE of Louisiana, Through the DIVISION OF ADMINISTRATION, Defendant-Appellee-Respondent.
No. 62649.
Supreme Court of Louisiana.
January 29, 1979.
Rehearing Denied March 5, 1979.
Dissenting Opinion March 7, 1979.
*1164 William J. Guste, Jr., Atty. Gen., Tommy D. Teague, Staff Atty., Dept. of Justice, Baton Rouge, for defendant-respondent.
Henry D. Salassi, Jr., Frank P. Simoneaux, Breazeale, Sachse & Wilson, Baton Rouge, for plaintiff-appellant.
TATE, Justice.
The public contract law requires that all public work done by a public entity shall be advertised and let by contract to the lowest responsible bidder. La.R.S. 38:2211 et seq. (1977). The issue before us is whether an awarding authority which advertises for bids must give adequate notice and a fair hearing on unfavorable charges to a bidder which the authority intends to disqualify as a non-responsible bidder; and if so, whether the disqualified bidder in this case was afforded these procedural protections under the facts of this case.
The plaintiff (low bidder, but disqualified by the agency as not responsible) sued to enjoin the letting of the contract to other bidders. The trial court's denial of a preliminary injunction[1] was affirmed by the court of appeal. 359 So.2d 693 (La.App. 1st Cir. 1978). We granted certiorari, 362 So.2d 576 (1978), to review the plaintiff's contention that, as low bidder on the contracts, before the rejection of its bid it was entitled to adequate notice and a fair opportunity to rebut the charges of irresponsibility upon which the state agency based its disqualification.
The facts are undisputed that the plaintiff, Haughton Elevator Division, was the lowest bidder on nine elevator maintenance contracts advertised by the Louisiana Division of Administration in the spring of 1977. Haughton was not awarded the contracts, however, based upon a determination by the Division of Administration that Haughton was not a "responsible" bidder under La.R.S. 38:2211. This disqualification was based upon allegedly unsatisfactory performance by Haughton of an earlier elevator maintenance contract covering elevators at Charity Hospital in New Orleans.[2]

I.
The basic statutory law governing this case is contained in La.R.S. 38:2211 et seq. This enactment provides that public works projects exceeding the sum of $5,000 be advertised for bid and that the contract be awarded to the "lowest responsible bidder."
The Louisiana jurisprudence interpreting this statute or its predecessors has long established that a low bidder may on a contract so advertised sue to set aside the award of the contract to another bidder and may enjoin the agency from the execution of such contract, where the agency arbitrarily rejected the low bid. Sternberg v. Board of Commissioners, 159 La. 360, 105 So. 372 (1925); Standard Highway Company v. Police Jury, 158 La. 294, 102 So. 819 (1925); St. Landry Lumber Company v. Mayor and Board, 155 La. 892, 99 So. 687 (1924).
The statute, insofar as it requires advertising and the obtaining of competitive bids, is a prohibitory law founded on public policy. It was enacted in the interest of the taxpaying citizen and has for its purpose their protection against contracts of public officials entered into because of favoritism and possibly involving exorbitant and extortionate prices.
See, e. g., Smith v. Town of Vinton, 216 La. 9, 43 So.2d 18, 21 (1949); Boxwell v. *1165 Dept. of Highways, 203 La. 760, 14 So.2d 627, 631 (1943).
The statute vests in the awarding authority the power and discretion to determine the responsibility of the bidder and to reject all bids if none is satisfactory, but the law does not permit the arbitrary selection of one which is higher and the rejection of others which are lower. The discretion must be exercised in a fair and legal manner and not arbitrarily. See, e. g., St. Landry Lumber Company v. Mayor and Board, 155 La. 891, 99 So. 687 (1924).
A comprehensive discussion of Louisiana law in this area is Housing Authority of Opelousas, La. v. Pittman Construction Co., 264 F.2d 695 (U.S.Ct.App. 5th Cir. 1959). As correctly summarized by that opinion:
Louisiana follows the general rule of vesting an awarding body with discretion subject to judicial review. Courts will not substitute their judgment for the good-faith judgment of an administrative agency. Nevertheless, an awarding body's administrative discretion must be exercised in a fair and legal manner and not arbitrarily. Consequently, the disqualification of the lowest bidder, without giving the low bidder a fair chance to disprove charges of irresponsibility, offends principles of fair play and is an arbitrary abuse of discretion inconsistent with the letter and the spirit of the Louisiana public contract law.

II.
The requirements of procedural due process apply to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated, the right to some kind of prior hearing is paramount. Board of Regents v. Roth, 408 U.S. 564, 569-70, 92 S.Ct. 2701 at 2705, 33 L.Ed.2d 548 at 552 (1972).
Under the Louisiana jurisprudential interpretations, La.R.S. 38:2211 creates a right in the lowest responsible bidder to receive the advertised contract, if any is let as a consequence of the biddings.
Under the Roth approach to procedural due process, a two-part analysis is followed. First, a determination must be made as to whether there has been a deprivation of a protected liberty or property interest. If there has not been, no hearing is required.[3] If, however, there has been such a deprivation, some type of "hearing" is required and a determination must be made as to what type on the basis of the nature of the protected private interests and the governmental interest at issue.[4]
In federal due process cases, the type of hearing required varies according to the nature of the protected interest involved.
For instance, in the temporary suspension of high school students, due process required "at least" the rudimentary safeguards "that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." Goss v. Lopez, 419 U.S. 565, 581, 95 S.Ct. 729, 740, 42 L.Ed.2d 725.
Pre-termination due process requirements for the discharge of a non-probationary civil service employee were held to be satisfied by a prior notice of the reasons and an opportunity for the employee to respond and challenge them in a non-evidentiary "hearing," since provision was made for a full evidentiary hearing following the termination and retroactive relief to the employee if the discharge was unjustified. Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). See, to the same effect, Matthews v. Aldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (termination of social security disability benefits).
*1166 On the other hand, Goldberg v. Kelley, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) required a full-blown evidentiary hearing prior to termination of welfare benefits, since the particular deprivation of private interest affected concerned persons on the very margin of subsistence who might be deprived of the means to live and to whom retroactive post-termination relief would be ineffectual.
In summary, the test for the type of hearing required, once it has been established that there has been or will be a deprivation of a protected interest, appears to be a balancing test. See Goldberg, cited above at 307 U.S. 262-65, 90 S.Ct. 1017-19: "`[C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.'" 397 U.S. 263, 90 S.Ct. 1018. Stated differently, "The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be condemned to suffer grievous loss * * * depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interests in summary adjudication." 397 U.S. 262-63, 90 S.Ct. 1017-18.

III.
The interests to be balanced in cases involving Louisiana's public bid law are the interest of a particular bidder in receiving the contract versus the public interest in having the contract awarded expeditiously to the bidder who can most economically perform the work in a responsible manner.
We find that a reconciliation of these interests requires at least the following procedural safeguards before a low bidder is disqualified as not responsible:
(1) An awarding authority which intends to disqualify a bidder must, prior to the award of the contract, give the bidder formal notice in writing that the authority is considering disqualifying the bidder from competing for the contract. This notice should specify the reasons for the proposed disqualification. The notification should contain specific language which puts the bidder on notice that the authority is considering disqualification, not mere questions about the bidder's past performance on state contracts or its ability to perform in the future.
(2) The bidder must be given the opportunity to respond to the charges in writing and, in all cases in which feasible, the bidder should have the opportunity to meet with officials of the awarding authority to discuss the charges against the bidder and his response thereto. This informal "hearing" does not necessarily include the right to call witnesses or cross-examine the persons who initiated the charges of irresponsibility.
(3) After this informal hearing, but before the award of the contract, the awarding authority must give the bidder formal written notice he has been disqualified from competing for the contract. This notice should list the specific reasons upon which the disqualification is based, although it may do so by reference to or incorporation of charges contained in the original notice.
(4) The "records" of this disqualification proceeding must be preserved so as to form the basis for any subsequent judicial review which might be sought by the bidder. (This post-rejection judicial review, with the retroactive relief affordable, sufficiently protects the low bidder's private interest against arbitrary rejection of its bid in the letting of the contract to a higher bidder.)

IV.
We now turn to a consideration of whether Haughton was afforded the procedural safeguards set out above.
The facts are undisputed that Haughton was the lowest bidder on all nine contracts advertised in the spring of 1977. However, Haughton was disqualified by the awarding agency as not being a "responsible" bidder under La.R.S. 38:2211 et seq. and was denied the award of any contract.
The Division of Administration concluded that Haughton was not the lowest "responsible" bidder based on its performance of a previous elevator maintenance contract *1167 which Haughton had with the State at Charity Hospital in New Orleans. During the Charity contract, which covered approximately forty elevators, an inspection was conducted for the Department of Health and Human Resources in September, 1976 by a consulting engineer. This engineer was accompanied by representatives of the Otis Elevator Company, which was the manufacturer of the elevators and which had the maintenance contract on the elevator from the time of their installation until 1974 when Haughton won the maintenance contract[5] for a period which (with optional renewal) ended in December 1976.
It is disputed whether Haughton had a fair opportunity to participate in the Charity inspection or to rebut the unfavorable report which resulted therefrom.
The court of appeal concluded that Haughton was informed of the inspection, was given an opportunity to participate, and was given the chance to rebut the contents of the unfavorable report. 359 So.2d at 694. As did the dissenting judge on that court, we conclude to the contrary.
Haughton was apparently informed of the inspection on the morning of the inspection. However, because a responsible party was not present in the office at the time of the notification of the inspection, Haughton did not participate in the inspection. Nevertheless, participation by Haughton in the inspection itself is not the crucial issue here.
The more important dispositive issues are whether Haughton was given adequate notice of the unfavorable report which resulted from the inspection, and whether Haughton was given a fair opportunity to rebut the findings.
The record does not indicate that the Division of Administration ever directed a copy of the consulting engineer's report to Haughton after the September inspection. Haughton got notice of the report's unfavorable evaluation of the service only indirectly as a result of an Otis employee who was on the inspection team giving a copy to the Director of Traffic at Charity Hospital who in turn gave a copy of the report to Haughton in October, 1976.
Upon receipt of the report, Haughton sent a letter of rebuttal to the Director of Traffic at Charity. There is no indication in the record that this letter was ever forwarded to the Division of Administration, which subsequently was the agency which disqualified Haughton. There is also no indication that Haughton ever received any formal response regarding its rebuttal.
Subsequent to the September 1976 inspection, the original Haughton contract on the Charity elevators expired. Through agreement with the Division of Administration, its service contract was extended until June 30, 1977. (On this date, new contracts were to be entered into for elevator services at Charity as well as the other eight contracts in dispute here.) Also, in January, 1977 the Division of Administration awarded Haughton a service contract on the elevators at the Charity Hospital School of Nursing for the period ending June 30, 1977.
From May 24, 1977 through June 21, 1977 bids on nine public building elevator maintenance and service contracts were opened. Haughton was the low bidder on all of the contracts, including those for Charity Hospital and the School of Nursing.
In June, 1977 the consulting engineer for the Division of Administration conducted another inspection of the elevators at Charity. On July 1, 1977, a meeting was held in the office of the Division of Administration to discuss the awarding of the nine contracts.
A representative of Haughton was present for the last part of this meeting, but he had no prior notice of the meeting or its purpose and no opportunity to rebut the allegations against his firm prior to the agency decision to disqualify Haughton. *1168 At this meeting, the Haughton representative was informed that Haughton was disqualified on all nine contracts based on its poor service on the Charity elevators. This disqualification came only after it had been determined that Haughton was the low bidder on all nine of the contracts to be let for the 1977-1978 fiscal year.

V.
We find that Haughton did not receive fair notice of the grounds for disqualification prior to the agency's decision to disqualify it, nor was it given a fair opportunity to rebut the unfavorable report.
At no time prior to the actual disqualification on July 1, 1977 was Haughton informed that the Division of Administration was considering that it be disqualified from bidding on any elevator service contracts. Haughton did receive a copy of the consulting engineer's September report, which pointed out alleged deficiencies in the service being rendered by Haughton at Charity; but this report contained no language which put Haughton on notice that the Division of Administration was considering disqualification of Haughton from competing on future contracts.
Even if the second-hand information received by Haughton were considered adequate notice of the possible disqualification, there is no indication that Haughton had a fair opportunity to respond to the charges of irresponsibility. Haughton did send a rebuttal letter to the Director of Traffic at Charity Hospital that pointed out the reasons for Haughton's belief that it was in good faith compliance with its contractual obligation; but there is no indication that this rebuttal letter was ever forwarded to the Division of Administration, or, more importantly, whether the Division of Administration considered this rebuttal letter in reaching its conclusion to disqualify Haughton.
As stated by the dissenting opinion in the court of appeal, after deficiencies were found in the September inspection, Haughton's response was received without comment or further action. Additional contracts were awarded to Haughton. Through the administrative inaction after the September report and the awarding of further contracts, Haughton was reasonably led to believe that it had satisfactorily explained its performance at Charity Hospital. However, it was informed only after it had submitted the lowest bids that it was disqualified from receiving future contracts.
We conclude, therefore, that Haughton was not afforded the minimum procedural due process required to protect its statutory property rights and that the previous courts erred in refusing to enjoin the defendant agency from awarding the contracts to any other bidder than Haughton, the low bidder.

VI.
Under the jurisprudence (see I above), the low bidder is entitled to appropriate relief if his low bid is arbitrarily rejected and the contract is awarded to another bidder. The relief awarded has included an injunction against the agency's entering into a contract with another bidder or the annulment of the contract awarded to the other bidder.
Certain factors in the present case have given us some concern as to the appropriate decree. These mainly arise from the silence of the record as to what occurred after the hearing on the rule for preliminary injunction held in July, 1977, after which a preliminary injunction was denied. According to the record, at that time the agency had not awarded the contracts, and each contract was being operated on a month to month basis until the courts determined the issue. Tr. 62.
However, the contracts were to be let for the fiscal year beginning July 1, 1977; this period has now expired.
In spite of the possible suggestion that the issue is moot, we ultimately determine that on the basis of the present record, the injunction should issue, with its consequent holding that the agency was not authorized to enter into contracts with other bidders than Haughton, the low bidder. Since such other contracts (if entered into) are an illegal deprivation of the plaintiff Haughton's property right, we are unable *1169 to say that Haughton is not entitled to some relief.
This is especially so, since the action sought further relief on the merits, whereas the interlocutory hearing concerned only a preliminary injunction sought to preserve the status quo until the trial on the merits.[6] In its interlocutory ruling which denied the preliminary injunction, the trial court specifically noted that its decision was not intended to dispose of the litigation on its merits (see footnote 1).
Here, for instance, although the prayer sought only injunctive relief as the final judgment on the merits (i. e., as well as the interlocutory relief sought by way of temporary restraining order and preliminary injunction), the petition might be supplemented [7] to claim damages[8] from the awarding authority, if it wrongfully awarded the contract to another bidder, or even perhaps from a higher bidder who wrongfully received the contract.[9]
Under the record before us, therefore, Haughton is entitled to the temporary injunctive relief prayed for, with what consequence as the law determines is appropriate under the facts which may have developed subsequent to the trial on the rule below. To do otherwise, would foreclose Haughton from obtaining its day in court as to appropriate relief it may obtain, if any, should the contract have been wrongfully awarded to another bidder despite its own low bid.

Decree
For the foregoing reasons, the judgments of the previous courts denying the plaintiff a preliminary injunction are reversed, and the case is remanded to the district court with instructions that it issue a preliminary injunction restraining, enjoining, and prohibiting the defendant Division of Administration *1170 or any person acting on its behalf from awarding the elevator and service contracts at issue to any person, firm, or corporation other than the plaintiff Haughton Elevator Division, the low bidder on such contracts. The defendant is to pay all costs of these preliminary-injunction proceedings in accordance with law; all other costs to await assessment on final termination of this litigation.
REVERSED AND REMANDED.
SUMMERS, C. J., dissents and assigns reasons.
BLANCHE, J., not participating.
SUMMERS, Justice (dissenting).
The question here is whether the Division of Administration of the State of Louisiana reasonably and fairly rejected the low bids of Haughton Elevator Division, Reliance Electric Corp., submitted in response to advertisement in accordance with the Louisiana Public Contracts Law.
The pertinent part of the Public Contracts Law provided at that time that all public work to be done by any public corporation or political subdivision of the state (exceeding certain sums) to be paid out of public funds shall be advertised and let by contract to the "lowest responsible bidder", who has bid according to the contract. La. Rev.Stat. 38:2211, now 38:2212.
Haughton has sued the State of Louisiana, Division of Administration seeking an injunction to restrain the Division of Administration from awarding certain elevator maintenance and service contracts to others. It is alleged that as a result of advertisements for bids Haughton was the lowest bidder, and the action of the Division of Administration in disqualifying Haughton was contrary to the Public Contracts Law because Haughton was the lowest responsible bidder.
On the strength of these allegations the trial judge issued a temporary restraining order enjoining and prohibiting the awarding of the elevator maintenance and service contracts in question. Then, upon trial of the rule for a preliminary injunction, the temporary restraining order was dissolved and the trial judge denied a preliminary injunction. On Haughton's appeal to the First Circuit the judgment of the trial court was affirmed. Certiorari was granted on Haughton's application. 362 So.2d 576.
Haughton is engaged in the business of manufacturing, installing and servicing passenger and freight elevators and escalators. Prior to June 25, 1974 the State advertised for bids on an elevator maintenance and service contract for 44 elevators at Charity Hospital in New Orleans. These elevators had been manufactured and installed by Otis Elevator Company and, until then, had been maintained and serviced by Otis. At the formal bid opening held on June 25, 1974 by the Division of Administration Haughton was the lowest bidder, and the contract was awarded to Haughton on December 16, 1974 for a term of one year with an option to renew for one year at the discretion of the Division of Administration if the services were satisfactory. After one year the State exercised its option and renewed the contract for an additional year through December 1976. In the meantime Haughton was awarded the elevator maintenance service contract on the Nurses' Home.
Prior to June 1977 the Division of Administration advertised for bids for the elevator maintenance and service contract for Charity Hospital of Louisiana in New Orleans and for the School of Nursing of Charity Hospital. The contracts were for the fiscal year beginning July 1, 1977. When the bids were opened on June 21, 1977 Haughton was the low bidder on the hospital contract. Otis Elevator was the only other bidder. Haughton was the only bidder on the School of Nursing contract. Haughton also bid on a number of other elevator maintenance and service contracts for the fiscal year beginning July 1, 1977.
On July 1, 1977 Haughton's representative was advised that its performance under the Charity Hospital contract had been unsatisfactory and Haughton was disqualified from all contracts presently pending in which Haughton was low bidder. All Haughton's contracts were then cancelled.
*1171 Sometime in 1976, prior to the December 1976 expiration of Haughton's contract, the State decided that a statewide survey of all elevator maintenance contracts and problems was necessary. While this survey was in progress, all elevator maintenance contracts were extended on a month-to-month basis, including Haughton's Charity Hospital contract.
To carry out this survey Lee Fournet, an engineer with the Department of Health and Human Resources, was directed by the Division of Administration to inspect every elevator in the state system. The purpose of the survey was to determine the quality of elevator maintenance under existing elevator maintenance contracts. To accomplish this assignment Fournet enlisted the assistance of Otis Elevator Company representatives and representatives of Tri State Elevator Company. In connection with the survey Fournet prepared a report in writing.
A written report of an on-site visit to Charity Hospital on September 1, 1976 was introduced into evidence by the State without objection by Haughton. Photographs taken of the elevators and its components and appurtenances involved in the maintenance contract are also in evidence without objection.
Generally, the report set forth, all equipment, including hoistways, pits, machine rooms and cars were dirty. Hoist ropes were rusty and some needed replacement. Governor ropes were extremely oily and covered with dirt and lint. Brake and governor pins were rusted. The governor for elevator No. 8 was frozen, preventing the fly-weights from moving and rendering the safety inoperative. All main elevator hoistway doors are out of proper adjustment and do not achieve full opening. Many doors create noises because they rattle. Cars do not level properly (either too high or too low). Door operators have worn parts, dirty and rusted chains, leaking gear boxes and worn deflector sheaves; generally they are improperly adjusted. Several door operator supports are broken or had missing bolts.
There were many frayed control wires and leads on controllers and selectors. Wiring is improperly run on controllers, selectors, and signal panels. Numerous exciter and generator sets have severe grooving or communicators which will require turning and undercutting to correct in many cases, especially in the Nurses' Home. The few wiring diagrams found at the building do not match the diagram numbers stamped on the data plates. Most machine rooms were void of spare parts as outlined in the contract specifications. Several car floors were worn and should be replaced. Door safety edges, on several cars, are badly worn and should be replaced. Signs of excessive oil leaks are evident in both the geared and gearless machines. Several field coils on main elevator motors are loose.
Insulation for the field coil is missing from the elevators in the Nurses' Home.
All elevators are tagged with safety tags dated from November 1969 to December 1969, indicating that these units have not been safety tested according to Section 1001 of the Safety Code for Elevators and according to paragraph (f) page 4 of specifications.
Most of the selectors have cotter pins and washers missing, allowing excessive movement of various parts. Some selector tapes appeared to be rusting. Several switch boxes were uncovered and almost every car had switch collars missing in car control panels.
In the outpatient clinic, the car top hatches were removed. Ark deflectors were missing on the control board and one car was inoperative.
The freight elevator in the warehouse was in deplorable condition, most doors had been malfunctioning or were inoperative for at least three weeks prior to the inspection date. The door operator chain was missing on two landings, although this elevator is required to be serviced once a week. To a large extent, the photographs in evidence support the findings in the report.
The report concluded that the inspection reflected neglect of service and maintenance and that major components had been *1172 allowed to deteriorate. Safety checks had not been made within the past seven years. The safety of the elevators at the time was questionable.
The report recommended that the elevators be repaired and placed under strict service in full compliance with the specifications and the Elevator Code.
Every effort should be made to restore the elevators and maintain them in "like new" condition. A multi-story operational hospital like Charity must depend upon elevators for its delivery system of patients, food, medical supplies, linen, staff and other essentials, the report concluded.
Upon receipt of a copy of the report Haughton replied on November 11, 1976 that the conditions pointed out were long existing and inherent with elevators of 20 to 40 years vintage. Most of the deficiencies pointed out in the report were present when Haughton took over the service, and there had been no deterioration, according to Haughton.
At the time of this written response, Haughton complained that Fournet was assisted by three employees of Otis Elevator Company, Haughton competitors. Complaint was made also that Otis was provided with a copy of the report and Haughton was not. Finally, Haughton charged that Fournet's report was biased in favor of Otis.
Otherwise Haughton answered the report, conceding that cleanliness could be improved and asserting, generally, that the deficiencies were present when they became responsible for maintenance and service. Otis, their predecessor who had the maintenance and service contract and who had manufactured and installed the elevators, was charged with the responsibility for the deficiencies.
As stated in Haughton's brief the sole issue to be decided is whether the action of the State was arbitrary in determining that Haughton was not "the lowest responsible bidder" within the contemplation of Section 2211 of Title 38 of the Revised Statutes.
Although it is Haughton's position that the sufficiency of the evidence to support Haughton's disqualification is not at issue, I am of the opinion it does present an issue and this subject will be discussed hereafter.
It was error Haughton argues, under procedures applicable to the Public Contracts Laws, for the State through its administrative agency, the Division of Administration, to fail to give Haughton adequate notice and an opportunity to rebut the unfavorable charges against them. As lowest bidder Haughton contends it was entitled to these considerations prior to being disqualified.
Haughton contends that it should have been notified of the complaints from Charity Hospital prior to the morning of the inspection. This argument is without merit. I believe the State is entitled to make unannounced inspections of contract performance without notifying the party who is responsible for performance. There is no reason to advise the contractor in advance in order that he may, as some would be prone to do, attempt to cover up the deficiencies which have existed. The State had the right to conduct what Haughton terms a clandestine investigation, and there is no statute which denies this right. If Haughton's performance had been according to its contract obligations I cannot see why they would object to a surprise inspection.
Nor do I believe, as Haughton argues, that the State improperly enlisted the aid of Otis representatives in its investigation. Because the elevators had been manufactured and installed by Otis, they were the logical people to inspect them and suggest the quality of the maintenance and service under Haughton's contract. Any person qualified to inspect the elevators would in all probability be a competitor of Haughton. There is no evidence in this record which would impugn the credibility of Otis or support a claim of undue influence on the part of their representatives. The charge of bias is unfounded.
Another objection to the procedure adopted by the Division of Administration is advanced by Haughton. They properly represent that the Division of Administration did not furnish them with a copy of Fournet's report of his on the site inspection of Charity Hospital. A copy of the report *1173 submitted some time prior to October 1976 was in the hands of Haughton's representative prior to November 11, 1976 for on that day Haughton submitted its lengthy and detailed response to the findings in Fournet's report.
In all fairness the Division of Administration should have furnished Haughton with a copy. However, a copy was obtained by Haughton from its contact at Charity Hospital, who had received a copy from an Otis representative. The copy of the report was received in ample time before the date for awarding contracts to enable Haughton to justify its position, which it attempted to do. The justification was considered inadequate by the Division of Administration and the record supports its determination. The deficiencies noted in Fournet's report were still present at the time Haughton was declared disqualified on July 1, 1977.
As the contentions are understood, Haughton also complains that at the time its representative was called into the meeting on July 1, 1977 when the decision was made to disqualify them, their representative was faced with a "fait accompli."
Haughton had from October 1976 until July 1, 1977 to remedy the deficiencies in its contract performance and to convince the awarding authorities of its responsibility as a bidder on the contract for the fiscal year 1977 by improving its performance on the existing contract. Their complaint that their representative was not permitted to advance their position on July 1, 1977 comes too late.
A public body has the right to take into consideration a number of factors in deciding who is the "lowest responsible bidder." The term "responsible bidder" is not limited in its meaning to financial resources and ability. What the public wants is quality performance of public contracts. Public authorities, therefore, are invested with discretionary powers to pass upon the honesty and integrity of the bidder, qualities which are essential to the faithful performance of the contract; upon the bidder's skill and business judgment; upon his experience and facilities for carrying out the contract; previous conduct under other contracts; and the quality of previous work; as well as the bidder's pecuniary ability. When that discretion is properly exercised the courts will not interfere. Housing Authority of Opelousas, La. v. Pittman Construction Co., 264 F.2d 695 (5th Cir. 1959); 64 Am.Jur.2d, Public Works and Contracts, § 70.
The Public Contracts Law of Louisiana is prohibitory in character. Its enactment is designed to advance the interest of the taxpaying citizen. Smith v. Town of Vinton, 216 La. 9, 43 So.2d 18 (1949). The statute means that the lowest bidder must have the contract if he is a responsible bidder. Highway Co. v. Police Jury, 158 La. 294, 103 So. 819 (1925). This court stated the principle applicable to the case at bar in St. Landry Lumber Co. v. Mayor and Board, 155 La. 892, 99 So. 687 (1924):
"We agree with counsel for defendant that the responsibility of the bidder is to be determined, not alone by his financial ability to perform the work, but that his experience and reputation for satisfactory work are of equal importance."
Because of this last quoted principle, I find that, contrary to Haughton's position, the sufficiency of the evidence establishing the grounds for its disqualification is relevant and material. That evidence has to do with the State's experience with Haughton on other contracts, particularly the maintenance and service of Charity Hospital. That experience has an important bearing on the responsibility of Haughton's bid. It was to avoid another like experience that the State disqualified Haughton and, I agree, properly so.
There has been no abuse of the discretion vested in the State in disqualifying Haughton.
I respectfully dissent.
NOTES
[1] The trial court stated that its denial of the preliminary injunction "has nothing to do with any subsequent trial on the merits of the case."
[2] In brief in this court, the state agency has indicated its intention to award the nine contracts to the second lowest bidder.
[3] For example, if within the proper exercise of its discretion the awarding authority determines that no contract will be let, under the terms of the statute the bidders have no protected interest in the award of a contract that requires notice, hearing, and reasons for rejection.
[4] For a general discussion of the right to a hearing, see Davis, Administrative Law of the Seventies, Chapter 7, (1976).
[5] It should be noted that Otis would subsequently be in competition with Haughton for renewal of the Charity contracts as well as for the other contracts awarded for the fiscal year 1977-1978 which are the subject of this dispute. We do not today pass on the serious issue of the propriety of utilizing the services of a competing bidder to investigate possible irregularities in the service provided by the bidder sought to be disqualified.
[6] A preliminary injunction is a procedural device interlocutory in nature designed to preserve the existing status pending a trial of the issues on the merits of the case, La.C.Civ.P. art. 3601. Schwegmann Brothers Giant Super Markets v. Louisiana Milk Commission, 290 So.2d 312 (La. 1974), Ridge Park v. Police Jury of Jefferson Parish, 210 La. 351, 27 So.2d 128 (1946).

Of course, there is often no need for a subsequent trial on the merits after there has been a full hearing on the issue when summary rule for the preliminary injunction is tried. However, unless the parties have agreed otherwise, see State ex rel. Guste v. City of New Orleans, 363 So.2d 678 (La.1978), cf. Borgnemouth Realty Co. v. Gulf Soap Corporation, 211 La. 255, 29 So.2d 841 (1947), the case is determined on its merits only after a full trial under ordinary process. Schwegmann Brothers Giant Super Markets v. Louisiana Milk Commission, 290 So.2d 312 (La.1974); Baton Rouge Cigarette Service, Inc. v. Bloomenstiel, 88 So.2d 742 (La. App. 1st Cir. 1956).
[7] See La.C.Civ.P. art. 1155: "The court, on motion of a party, upon reasonable notice and upon such terms as are just, may permit mover to file a supplemental petition or answer setting forth items of damage, causes of action or defenses which have become exigible since the date of filing the original petition or answer, and which are related to or connected with the causes of action or defenses asserted therein."
[8] A private person is liable for damages (here, apparently the loss of profits) to repair the injury caused by the breach of a duty owed by contract, La.Civ.C. art. 1934, or by his fault for which he is delictually responsible, La.Civ.C. art. 2315. By the 1974 state constitution, a governmental entity is not immune "from suit and liability in contract or for injury to person or property." Art. 12, Section 10. At least arguably, the wrongful conduct of its employees makes the state liable for damages in the same manner as would be a private corporation for the wrongful acts of its employees which violated a duty owed to a person thereby injured.
[9] It appears doubtful to us that a higher bidder should be held liable for damages, if the contract is improperly awarded to it by a governmental agency (unless perhaps it participated in the commission of the wrongful act, La. Civ.C. art. 2324).

Nevertheless, in the single incident we could find where after the agency had improperly rejected a lower bid, the contract was actually performed by the higher bidder, the contract was nevertheless annulled, Housing Authority of Opelousas v. Pittman Construction Co., 264 F.2d 665 (U.S.Ct.App. 5th Cir. 1959), and the successful (higher) bidder was denied recovery on the contract price and allowed only costs incurred by him, without any allowance of profits. Marquette v. Housing Authority of Opelousas, 157 So.2d 374 (La.App. 3d Cir. 1962). There, however (unlike the present situation), the higher bidder was a party to the original suit which declared the contract null as awarded in violation of the public contract law.