COVINGTON, Chief Judge.
This case involves the inadvertent release of insurance payment records to the parents of a former patient of Jo Ellen Smith Psychiatric Hospital, the plaintiff. These records, sometimes referred to as “Blue Cross Provider Registers,” or “registers,” contained the last name, beginning initial of the first name[1] and social security number of 39 patients at the Psychiatric Hospital, who were Blue Cross insureds. These registers document payment by Blue Cross to the hospital, a psychiatric, drug and alcohol treatment facility, for services the hospital rendered to the named insureds or their dependents.
Robert Lailheugue, IV, a minor, was an in-patient at the hospital. He was covered, for the most part, under a Blue Cross policy in the name of his father, Robert Lail-heugue. Following the patient’s discharge from the facility, the hospital records showed an outstanding balance which had not been covered under the policy. In an *887 effort to collect the outstanding amount, Cynthia Jones, Account Services Representative at the hospital, phoned Mrs. Debra Lailheugue, the patient’s mother, on January 5, 1988. During this conversation Mrs. Lailheugue indicated she was unaware that there was a balance due, and requested proof of payments by Blue Cross, in order to ascertain what items had been excluded or had not been paid.
Mrs. Jones copied the Blue Cross registers for all payments made on the Lail-heugue account and mailed them to Mrs. Lailheugue. The registers received by Mrs. Lailheugue listed not only her husband’s last name, first initial and social security number, but the same information concerning 38 other insured patients. Mrs. Lailheugue received the registers on January 7, 1988, and phoned Mrs. Jones about them the following day. During this particular conversation, Mrs. Jones apologized for failing to delete the information concerning other patients, assured Mrs. Lail-heugue that this information had been given to no one else identified in the registers, or to anyone else, and confirmed that it was not a policy of the Psychiatric Hospital to divulge this information. She admitted she had erred in this instance, and she confirmed this conversation in a letter, January 11, 1988, to Mr. and Mrs. Lailheugue.
On January 14, 1988, one of the named defendants, Marlise Harrell, an attorney-at-law, wrote to Richard Corkern, Patient Accounts Manager of Jo Ellen Smith Psychiatric Hospital, advising that she had been retained by the Lailheugues and was seeking amicable settlement for the Lail-heugues’ injuries, based on the registers having been sent to the 38 other patients (policy holders).
Ms. Harrell’s letter was answered by Laurie Catron, Vice President and Staff Attorney of H.P.I.C. Management Company, national counsel for Jo Ellen Smith Psychiatric Hospital, first by telephone and then by letter. Ms. Catron’s letter, dated January 21, 1988, confirmed the information previously given that the registers had been given to no person other than Mrs. Lailheugue.
The instant action came about when Ms. Harrell wrote to Ms. Catron a letter dated January 24, 1988, advising that she and/or her clients would contact the 38 other patients if the Psychiatric Hospital failed to work out an amicable settlement with the Lailheugues. A temporary restraining order and rule to show cause was signed by the Honorable Joseph E. Anzalone, Judge of the Twenty-first Judicial District Court, on February 8, 1988, ordering Marlise Harrell and Mr. and Mrs. Lailheugue to refrain from disseminating the information contained in the registers to any person in any form. Judge Anzalone also granted plaintiff’s request that the record be sealed due to the sensitive nature of the information in question.
The rule was originally scheduled for hearing on February 12, 1988, but was continued on request of counsel for defendants, with the temporary restraining order being extended an additional ten days. The rule was heard on February 29, 1988, by the Honorable Kenneth J. Fogg, Judge of the Twenty-first Judicial District Court.
At the inception of the hearing, defendants filed a reconventional demand and an opposition to the granting of a preliminary injunction.
After the hearing, the application for a preliminary injunction was denied, but the court ordered the temporary restraining order to remain in effect by consent of counsel until the appeal delays had run or until an appeal taken from the judgment was finally decided.
After considering the evidence at the hearing, Judge Fogg heard arguments of counsel, and then dictated the following into the record:
The Court finds that the defendants have a right to contact persons named on the Blue Cross documents in order to further investigate the possibility of a claim against Jo Ellen Smith Psychiatric Hospital. The State Statutes do not restrict this right. The Court further finds that the plaintiffs have [sic] failed to demonstrate that it will suffer irreparable injury. The preliminary injunction requested is denied. The temporary restraining or *888 der is recalled and vacated. All costs are charged to the plaintiff. Judgment will be signed accordingly.
On appeal, the plaintiff has assigned the following errors:
1. The trial court erred in finding that the patient’s right to investigate the possibility of a claim against Jo Ellen Smith Psychiatric Hospital outweighed the rights of the 38 other patients on the list to privacy and privilege with respect to the confidentiality of their patient records.
2. The trial court erred in finding that Jo Ellen Smith Psychiatric Hospital had not shown a prima facie case entitling it to preliminary injunction, specifically in finding that it was required to prove irreparable harm and failed to do so.
1. PATIENT’S RIGHT TO INVESTIGATE
We find that the party defendant’s right to investigate the possibility of a claim against Jo Ellen Smith Psychiatric Hospital is outweighed by the rights of the 38 non-party patients to privacy and privilege with respect to the patient-identifying information contained in the Blue Cross registers.
The oral reasons assigned by the trial judge show that, in his opinion, the patient’s “right” to contact other patients is based on his “right” to investigate the possibility of a claim against Jo Ellen Smith Psychiatric Hospital.
Discovery, the means by which a party investigates the possibility of a claim, is broad in scope but not without its limitations. See La.C.C.P. art. 1422.
Article 1422 provides as follows:
Unless otherwise limited by order of the court in accordance with this Chapter, the scope of discovery is as set forth in this Article and in Articles 1423 through 1425.
Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence. (Emphasis added).
This Court has recognized, in Brasseaux v. Stand-By Corporation, 371 So.2d 1174, 1176 (La.App. 1 Cir.1979), that informal discovery is governed by the same rules as formal discovery. We stated in Brasseaux:
The discovery provisions of the Louisiana Code of Civil Procedure which are analogous to the federal provisions are grounded on the principles of fairness and judicial efficiency. One of the reasons for providing for court ordered discovery and sanctions for noncompliance is to promote the purposes of discovery. A side effect of the discovery provisions is the exchange of information between litigants without having to utilize the courts. The net effect is an enhancement of the comity and custom between attorneys toward the end of expeditiously handling litigation. Thus, if discovery can be made by means of a court order, it encourages the exchange of information without a court order. This custom is to be encouraged to promote the effectiveness of the judicial system and prevent the unreasonable delay of its function. Evidence of these intentions is found not only in our constitution, Article I, Section 22 of the Louisiana Constitution of 1974, but also in the Louisiana State Bar Association’s Ethical Considerations and Disciplinary Rules. See DR 1-102(A), EC 7-38, DR 7-106(C).
Louisiana courts have authority in this context to make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense, including that certain matters may not be inquired into. La.C.C.P. article 1426.
*889 In the case at bar, there is a pending claim by the patient’s family against Jo Ellen Smith Psychiatric Hospital for alleged damages arising out of receipt or dissemination of a list containing 39 patient names. The Lailheugues seek to contact the other listed patients on the basis that such contact is the only way they can determine whether the list was disseminated to the other 38 patients. Competing interests are the right to privacy and protection from annoyance and embarrassment of the 38 patients against the right of the Lail-heugues to discover information for presentation at the trial. Also, implicit in this issue, is the privileged nature of the information which the Lailheugues seek to disseminate.
In Plaquemines Parish Commission Council v. Delta Development Company, Inc., 472 So.2d 560 (La.1985), the Parish Commission Council brought action against certain holders of mineral rights alleging that the mineral rights had been taken from the Parish by named Parish officials. The district court issued a partial protective order prohibiting dissemination of financial information relating to defendants who were not public officials. The Court of Appeal, Fourth Circuit, amended the order to include all defendants; and the Supreme Court reversed the appeal court’s ruling, and reinstated the order of the district court.
In its opinion, the Supreme Court stated: However, public officials do, by virtue of undertaking public office, surrender ‘the privacy’ secured by law for those who elect not to place themselves in the public spotliqht. Plaquemines at 567. (Emphasis added).
Clearly, the other patients on the list in the defendants’ possession not only have not sought the public spotlight but have a reasonable expectation of privacy in the fact that they or their dependents have been treated at a psychiatric, drug and alcohol rehabilitation facility.
Where Plaquemines addressed the privacy rights of defendants in having certain personal information divulged, the United States Supreme Court addressed the right to privacy of third parties, not involved in the litigation. In Seattle Times Co. v. Rhinehart, 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984), a religious group filed suit against a newspaper alleging defamation and invasion of privacy resulting from various articles published by the newspaper. The religious group’s alleged damages were loss of memberships and loss of contributions. To investigate these damages, the newspaper was given access to the names of members of the organization as well as contributors to the organization over the previous five years. As in the case at bar, the organization sought an order restricting the newspaper from publishing, disseminating or using that information pertaining to third parties in any way except when necessary to prepare for and try the case. The United States Supreme Court upheld the granting of the protective order. In so doing, the Supreme Court stated:
... judicial limitations on a party’s ability to disseminate information discovered in advance of trial implicates the first amendment rights of the restricted party to a far lesser extent than would restraints on dissemination of information in a different context.
A more compelling privacy interest belongs to the 38 patients of a psychiatric, drug and alcohol rehabilitation facility than it does to donors and members of a religious organization or owners of oil and gas leases which have already been the subject of much public scrutiny, as in the cited cases.
The 38 individuals, non-parties in this action, have a right to privacy in the fact that they or their dependents were hospitalized at a psychiatric, drug and alcohol rehabilitation facility. The means by which plaintiff gained access to that information does not and cannot deprive those patients of their right to privacy. The information concerning these patients was not in the public domain and it does not pertain to public figures.
We find that the court below erred in failing to recognize those patients’ rights to privacy, and we order the patient at bar *890 and other defendants to refrain from use of this information in any form other than in preparation and use at trial.
Moreover, a patient’s medical records, including financial statements, are privileged and disclosure of such information is limited to those situations set forth in La.R.S. 13:3734, La.R.S. 40:1299.96, and La.R.S. 40:2144.
La.R.S. 13:3734 provides, in pertinent part:
A. As used in this Part: ...
(5) “Communication” means the acquiring, recording or transmittal, of any information, in any manner whatsoever, concerning any facts, opinions or statements necessary to enable the health care provider to diagnose, treat, prescribe or to act for the patients; said communications may include, but are not limited to any and all medical records, office records, hospital records, charts, correspondence, memoranda, laboratory tests and results, x-rays, photographs, financial statements, diagnoses and prognoses.
[[Image here]]
B. Except as hereinafter provided, in civil cases, proceedings before a medical review panel, pursuant to R.S. 40:1299.47 and in medical and dental arbitration proceedings, pursuant to R.S. 9:4230-4236, and in proceedings and investigation preliminary to all such actions, a patient or his authorized representative, has a privilege to refuse to disclose and to prevent a health care provider from disclosing any communication, wherever made, relating to any fact, statement or opinion which was necessary to enable that health care provider or any other health care provider to diagnose, treat, prescribe or act for the patient.
[[Image here]]
La.R.S. 40:1299.96 provides, in pertinent part:
A. Each health care provider shall furnish each patient, upon request of the patient, a copy of any information related in any way to the patient which the health care provider has transmitted to any company, or any public or private agency, or any person.
[[Image here]]
La.R.S. 40:2144 provides in pertinent part:
[[Image here]]
B. Hospital records are subject to reasonable access to the information contained therein by the patient or his authorized representative as hereinafter provided.
C. The patient or his authorized representatives may request and obtain copies of his hospital records in the manner set forth in Subsection D.
D. Upon request in writing signed and dated by the person initiating the request, the hospital shall, except for good cause shown, such as medical contraindication, furnish the records as soon as practicable and upon payment of the reasonable cost of so providing....
These statutes limit the disclosure of such evidence, absent consent or request of the patient, to a pending matter in which the patient’s medical condition is in issue, a medical review panel, medical or dental arbitration or proceedings ancillary to those. None of those situations exist here.
Defendants argue that State law does not prohibit their redisclosure of the information that has erroneously come into their possession. This can only be based upon an assumption that the patient’s privilege has been waived by the initial disclosure. The fallacy in this is the assumption that anyone other than the patient could waive the patient’s privilege. This is not the hospital’s privilege, and any action by the hospital cannot affect the patient’s right to confidentiality. This confidentiality must be preserved, under the circumstances of this case.
2. HOSPITAL’S RIGHT TO PRELIMINARY INJUNCTION
We find that the trial court erred in denying the request of the Psychiatric Hospital for a preliminary injunction.
In cases of this nature, injunctive relief is available as a remedy where the petition *891 er shows that it will suffer irreparable injury if such relief is not granted. La.C. C.P. arts. 3601, 3602.
The purpose of injunctive relief is to prevent irreparable harm. Irreparable harm is the sine qua non of any form of injunc-tive relief. Irreparable injury is considered to be a loss sustained by an injured party which cannot be adequately compensated in money damages, or for which such damages cannot be measured by a pecuniary standard. Terrebonne Parish Police Jury v. Matherne, 405 So.2d 314 (La.1981); Deer Slayers, Inc. v. Louisiana Motel and Investment Corporation, 434 So.2d 1183 (La. App. 1 Cir.1983); writ denied, 440 So.2d 151 (La.1983). Caffery v. Powell, 320 So.2d 223 (La.App. 3 Cir.1975).
The jurisprudence requires the applicant for injunctive relief to make a prima facie showing that it is entitled to the relief sought and that it will suffer irreparable injury if it is not granted. Federal National Mortgage Association v. O’Donnell, 446 So.2d 395 (La.App. 5 Cir.1984); Deer Slayers, Inc. v. Louisiana Motel and Investment Corporation, supra.
On the issue of the trial court’s denial of the preliminary injunction, we observe that the granting of such injunctive relief is merely an interlocutory judgment calculated to prevent a party from suffering irreparable injury pending a final determination on the merits of its rights and in such cases to generally maintain and preserve the existing status pending a trial or a hearing on the ultimate issues. Haughton Elevator Division v. State, through the Division of Administration, 367 So.2d 1161 (La.1979); Federal National Mortgage Association v. O’Donnell, supra.
We find that the hospital will suffer irreparable injury if the Lailheugues or their attorneys or agents are permitted to contact the other listed patients or insureds. From our review of the record, we conclude that the Hospital’s evidence was sufficient to make out a prima facie case, that it was entitled to the relief sought and that it will suffer irreparable injury if not granted.
At the hearing, Mrs. Debra Lailheugue testified that her son was a patient at Jo Ellen Smith Psychiatric Hospital and that in connection with the bill for services rendered to her son she spoke with Cynthia Jones in the Patient Services Department on or about January 5, 1988. At that time Mrs. Lailheugue was advised by Mrs. Jones that she had an outstanding balance, of which she was not aware. Mrs. Lail-heugue agreed to pay off the balance but requested that she receive some explanation of the charges before doing so. Following this telephone conversation, Mrs. Lailheugue received a manila envelope from Cynthia Jones containing some 39 patient names, including the name of R. Lail-heugue. She understood these to be Blue Cross registers with the amount Blue Cross had paid on each of the accounts. The amounts pertaining to R. Lailheugue were highlighted in pink, and there was handwriting on the document identifying what had been excluded from payment. Upon identification by the witness as the document she received, copy of the original Blue Cross payment register was admitted into evidence. Mrs. Lailheugue testified that this document did not contain the information she had requested, but she assumed that it was information from Mrs. Jones in response to her inquiry. She received this document on or about January 7, 1988, and called Cynthia Jones the following morning. During this conversation Mrs. Jones apologized for sending the registers out in that form and apologized for any anguish she had caused. Mrs. Lail-heugue received a letter from Mrs. Jones, dated January 11, 1988, advising that the registers had gone only to Mrs. Lail-heugue, and that this “was a mistake that has never been made before and never will be made again.” Mrs. Lailheugue further testified that her husband had a highly sensitive job at the Waterford Three Nuclear Power Plant in Taft, Louisiana, and their concern was not only over the possible revelation of their son’s treatment, but also the possible confusion in peoples’ minds of the son with the father because the father’s name was listed on the register. Mrs. Lailheugue admitted that she had no reason to believe that these registers went to anyone other than herself.
*892 On direct examination, Mrs. Lailheugue testified to the anxiety her son experienced during the period he was hospitalized in an attempt to cover up the fact that he was at Jo Ellen Smith Psychiatric Hospital. Mrs. Lailheugue further testified that they placed their house up for sale and moved to Holden, Louisiana, to escape the ridicule her son was experiencing at this revelation, as well as for other reasons. She admitted that her son had told students of his own accord that he was hospitalized at the hospital, and that students were telling other students at his high school. She admitted that these students learned of her son’s hospitalization from him and not in any manner connected with the Blue Cross payment registers. Mrs. Lailheugue further stated that her son had obtained the phone numbers of those persons on the list who he recognized, but they had not yet contacted them. On re-cross-examination, Mrs. Lailheugue admitted that these were people who already knew that her son had been hospitalized since they were patients there with him.
Cynthia Jones was called on direct examination as part of plaintiff’s case in chief, and she testified that she is a Patient Services Representative in the business office of Jo Ellen Smith Psychiatric Hospital. Her job entails collections, following up on discharged accounts and handling insurance claims. She was assigned patient accounts based upon the first letter of the last name. On January 5, 1988, she was handling the “L” accounts through the end of the alphabet; and, in that capacity, she phoned Mrs. Lailheugue to advise that the Lailheugues had an overdue balance with the hospital. Mrs. Lailheugue said that she was unaware of an overdue balance, and requested proof of the payments from Blue Cross. Mrs. Jones testified that the Blue Cross provider registers were the only proof the business office had regarding payments by Blue Cross. She stated that the standard policy employed by the hospital when a patient asked for that information was to tell patients that they would have to request an E.O.B. (“explanation of benefits”) from the insurance company, Blue Cross. Mrs. Jones, however, in the instant case, did not follow the standard policy, but inadvertently mailed the payment registers which showed payments from Blue Cross and outlined what was not covered. Mrs. Jones identified the original payment registers, copies of which she had forwarded to Mrs. Lailheugue, showing the payments by Blue Cross.
Mrs. Jones stated that she had never before sent out the Blue Cross registers to any patient on any account, and she has not done it since. She said that she did not send a copy of these payment registers or any other information about the Lail-heugues to any other patients on this list, or to anyone else.
At the time in question she supervised the patient accounts, L through Z, and knew of her own personal knowledge that none of the payment registers went to anyone with accounts L through Z. She said that, at that time, Christine Shipley controlled accounts A through K.
Mrs. Jones testified that on January 8, 1988, she spoke with Mrs. Lailheugue, who expressed her displeasure at being sent registers which included other names. Mrs. Jones explained to Mrs. Lailheugue, during that conversation, that these registers were sent to no one but Mrs. Lail-heugue. Following that conversation, Mrs. Jones wrote a letter to Mr. and Mrs. Lail-heugue, dated January 11,1988, which was admitted into evidence. In that letter she apologized for her error and again explained this was not a policy of the hospital, that the error had never been made before nor would it be made again, and that the Blue Cross registers went to no person except Mrs. Lailheugue.
In handling accounts L through Z, Mrs. Jones has never received any type of inquiry from any other accounts questioning why they might have received Blue Cross payment registers or angry that they had. If any of the accounts had received such information and had made such an inquiry, the information would have come to her attention or that of her supervisor, Richard Corkem. The only ones in the department who would have had access to any such information would have been Richard Cor- *893 kern, the manager, Christine Shipley, Patient Account Representative for accounts A through K, and Mrs. Jones for accounts L through Z.
Mrs. Jones became a Patient Services Representative in June of 1987, and stated that she did not know of any previous representative sending out registers, as she had inadvertently done.
Christine Shipley testified, on direct examination as part of the plaintiffs case in chief, that she is currently a Patient Services Representative at the Psychiatric Hospital and has been employed in that position since January of 1988. In that position she performs patient account billing and posts payments received from insurance companies. She is also involved in collection work. In January of 1988, she was handling patient accounts A through K. In her capacity as a Patient Services Representative she handles payment registers. She had reviewed the payment registers sent to Mr. and Mrs. Lailheugue by Cynthia Jones. She stated that she did not send those payment registers to any of her patient accounts. She stated that she has never sent out a payment register with information on other patients to any patient. She testified that it is the standard policy of Jo Ellen Smith Psychiatric Hospital for a patient to be told to contact Blue Cross directly if they seek an explanation of benefits. The witness testified that none of payment registers, accounts A-K, were ever mailed to anyone. If a complaint were to come in from a patient that they had erroneously received a payment register on accounts A through K, either she or her supervisor, Richard Corkern, would have been the only ones receiving the complaint or inquiry. In January of 1988, only three people would have received those complaints, Cynthia Jones, Richard Corkern and the witness. She has never received any complaints from any of the people on her list because “we never send those out.” She has never heard of any patient having received a payment register.
.Marlise Harrell, one of the defendants, was called on cross-examination as part of plaintiff’s case in chief. Marlise Harrell was an attorney who has been retained to represent the interests of Mr. and Mrs. Robert Lailheugue. In that capacity she reviewed the Blue Cross registers which were admitted into evidence. In her capacity as attorney for Mr. and Mrs. Lail-heugue, she reviewed the letter from Cynthia Jones dated January 11. Following her review of that letter, she wrote a letter dated January 14 addressed to Richard Corkern. With reference to that letter, Ms. Harrell stated:
I informed him that the Lailheugues are most distressed that they would send 39 patients or that they would send 39 patients a list with Mr. Lailheugue’s name and social security number on it.
She admitted that at the time she wrote this letter she was aware that the hospital through Cynthia Jones had already stated that the information had been sent to no one other than her clients.
Ms. Harrell recalled speaking with Laurie Catron of H.F.I.C. Management Company, national counsel for Jo Ellen Smith Psychiatric Hospital, following her submission of this letter. During this telephone conversation Ms. Catron again assured Ms. Harrell that the provider register went to no one other than Ms. Harrell’s client. Ms. Catron followed up with a letter dated January 21, 1988, in which Ms. Catron assured Ms. Harrell that the provider registers had gone to no one other than her client. Ms. Catron enclosed sworn affidavits of Cynthia Jones, Richard Corkern, Patient Accounts Manager, and Wendell Wilkes, Controller, all attesting to the fact that the provider registers went to no one but the Lailheugues. Following receipt of this letter, Ms. Harrell wrote the letter dated January 24, 1988. In this letter, Ms. Harrell advises that she will be required to contact the individuals listed unless Jo Ellen Smith Psychiatric Hospital agreed to pay $55,-000.00. In exchange for this $55,000.00 defendants would return the provider registers. The Psychiatric Hospital was given 30 days within which to consider this “settlement” offer. Ms. Harrell testified that despite the many assurances of the Hospital, including sworn affidavits, it was not her practice to believe everything that her *894 opponent said. She also testified that other than the mere fact that her client had received the Blue Cross register, she had no reason to believe that any other person had received it.
Plaintiff’s final witness was Richard Cor-kern, Patient Account Manager of Jo Ellen Smith Psychiatric Hospital, who testified that he is the supervisor of Cynthia Jones and Christine Shipley. He testified that the Psychiatric Hospital treats both psychiatric patients and drug and alcohol rehabilitation patients. In his official capacity he is familiar with the purpose and use of Blue Cross registers. He testified that when Blue Cross sends out payment registers they do not separate the registers by type of patient, but by date of payment. Therefore, on any given register there could be the last name and first initials of strict psychiatric patients, drug and alcohol rehab patients, sexual dysfunction patients and others. The register is listed in alphabetical and contract number form. The information contained on the payment register is the date of service, the billing service, the contractual amount. There is no identification on the record regarding the illness for which the patient was treated. If any patient has a question about their account, it is Christine Shipley or Cynthia Jones who could answer; but if they had a complaint they wanted to take beyond those ladies, the complaint or inquiry would go directly to Mr. Corkern. Mr. Corkern has not been contacted by any of the other patients on the registers which were sent to Mrs. Lailhuegue.
As custodian of the records sought to be disseminated, Jo Ellen Smith Psychiatric Hospital asserted the irreparable harm which would be caused by dissemination of this information any further than it had already been disseminated.
The Psychiatric Hospital asserted the irreparable damage to the reputations and livelihoods of those 38 persons not party to this litigation. The Hospital also asserted the irreparable damage to the business and reputation of Jo Ellen Smith Psychiatric Hospital.
We find that the Psychiatric Hospital has made a prima facie showing, as discussed above. On the other hand, defendants have made no showing that dissemination of this information is necessary. Mrs. Lail-heugue testified she had no reason to believe the registers were sent to anyone but her, other than the fact that she received the registers as stated above. Ms. Harrell, attorney for the Lailheugues, testified that she had no reason to believe the registers went to anyone other than her client, except the fact that her client received the list. The Psychiatric Hospital provided defendants with the affidavits of Cynthia Jones, Richard Corkern and Wendell Wilkes, all of whom confirmed that the registers had been sent to no one other than the Lailheugues. Further Cynthia Jones, Richard Corkern and Christine Ship-ley testified in trial court to the same facts, as detailed above.
For the foregoing reasons, we reverse the judgment denying the preliminary injunction, but maintain the temporary restraining order in effect until final disposition of this matter on the merits. We grant judgment in favor of Jo Ellen Smith Psychiatric Hospital and against the defendants, Marlise 0. Harrell, and Mr. and Mrs. Robert Lailheugue, individually and as parents of Robert Lailheugue, IV, a minor, restraining and enjoining the defendants, their officers, agents, employees, counsel and those persons in active concert or participation with them, from contacting the patients listed on the Blue Cross Provider Registers and/or the families of such listed patients, from disseminating the information contained on said registers, from discussing this matter with anyone other than their counsel, and from reproducing said registers and from publishing said registers in any manner. Further, we maintain the order of the trial court sealing the record in this matter. We remand this matter to the trial court for trial on the merits of the permanent injunction. The appellees are cast for costs of this appeal.
REVERSED AND REMANDED.

. Actually, the register lists the first several letters of the patients’ name, generally a contraction of the given name if it is longer than four letters.