ROLAND L. BELSOME, Judge.
1 tThis is an appeal from a June 10, 2015 judgment in Civil District Court denying Two Canal Street Investors, Inc.’s (“TCSI”) Motion for Preliminary Injunction. TCSI, an unsuccessful bidder in a Request for Proposal, sought a preliminary injunction to prohibit the City of New Orleans (the “City”), the New Orleans Building Corporation (the “NOBC”), Carpenter & Company, Inc. (“Carpenter”), Woodward Interest LLC (‘Woodward”) and, the Carpenter/Woodward affiliate, Two Canal Owner, LLC (“Lessee”) (collectively, “Defendants”), from taking any further action in furtherance of, or incurring any further obligations in connection with, any lease concerning the public property at issue in this case. The trial court denied TCSI’s Motion for Preliminary Injunction. We affirm.

FACTS AND PROCEDURAL HISTORY

This case arises out of the redevelopment of the former World Trade Center Building (the WTC”) located at 2 Canal Street, New Orleans, Louisiana. The City sought to redevelop and lease the property through the NOBC, a nonprofit public benefit corporation, organized by the City for the purposes of owning, | leasing, developing, and operating properties owned by the *281 City.[1] Accordingly, the NOBC owns and manages the former WTC building at 2 Canal Street, and leases the land on which the building lies from the City (and is authorized by ordinance to act as its manager).
On September 24, 2014, the City and the NOBC jointly issued a Request for Qualifications (“RFQ”) for the redevelopment of the WTC. Thereafter, the City appointed a five-member “Selection Committee” comprised of City officials and employees to evaluate the RFQ submissions using the criteria set forth in the RFQ.[2] On December 15, 2014, after a public hearing was held on the submissions, the Committee selected and announced that the following five proposers were .invited to submit redevelopment proposals at the next stage (Phase 2) of the bidding process: TCSI; Carpenter/Woodward; HRI Properties, LLC (“HRI”); 2 Canal Street Redevelopment, LLC (“2 Canal Redevelopment”), and Oxford Capital Group, LLC (“Oxford”).[3]
In early January, 2015, the RFP for the Redevelopment of Two Canal Street was issued by the NOBC and the City. On February 16, 2015, the five finalists submitted their proposals. The City Consultants were assigned to evaluate the RFP submissions and communicate with the Selection Committee as to the substance of each proposal. Thereafter, the City Consultants, in accordance with the RFP, negotiated privately with each proposer, and each was asked to submit a “Best and | ¡¡Final” offer.[4] After each finalist submitted its “Best and Final” proposal and supplemental information to the Selection Committee, the NOBC Consultants prepared various documents analyzing and summarizing each submission. On March 24, 2015, the Selection Committee held a public meeting to consider the respective proposals. At the conclusion of the hearing, each member of the Selection Committee scored the proposals with regard to the criteria set forth in the RFP. Carpenter/Woodward attained the highest score from each of the Selection Committee members and was recommended for the award of the Lease, subject to approval by the NOBC Board of Directors and the City Council.
On March 31, 2015, the NOBC’s Board of Directors met at a public meeting to review the Selection Committee’s recommendation. After hearing public com *282 ment, a quorum of the Board voted unanimously to adopt the recommendation of the Selection Committee and -award the Lease to Carpenter/Woodward. On May 7, 2015, the New Orleans City Council voted to authorize the Mayor to execute the Lease Agreement negotiated by the NOBC with Carpenter/Woodward.
On April 23, 2015, after submitting a Public records Request to the City and a formal protest letter to the NOBC, TCSI filed a Petition for Appeal and Declaratory Judgment to the district court seeking review' of the NOBC’s decision to award the Lease to darpenter/Woodward, and a declaration that the selection |4process was invalid. TCSI later amended its petition requesting the issuance of a temporary restraining order and adding claims .for injunctive relief. After conducting an emergency TRO hearing, the district court denied the request for a temporary restraining order. Thereafter, Carpenter/Woodward intervened as a party defendant.
. On May 19, 2015, the trial court conducted a hearing on TCSI’s Motion for Preliminary Injunction and took the matter under advisement. On June 10, 2015, the court, applying the legal principles of La. C.C.P. art. 3601, et seq., entered a judgment denying TCSI injunctive relief. The district court reasoned that La. R.S. 41:1215(B) allows for. the letting of a lease by a public-benefit corporation without requiring the entity to utilize the sole criteria of “highest rent,” as it would under * La. R.S. 41:1215(A).[5] Considering La. R.S. 41:1215(B) in conjunction with La. R.S. 41:1212(G), which provides that leases negotiated by a public benefit corporation must achieve “a fair and equitable return of -revenue,” the court found that the Selection Committee graded each proposal according to the criteria set forth in the RPP, noting that “highest rent” was but just one of the criteria properly considered. Accordingly, the court found that TCSI did not demonstrate the requisite irreparable harm or likelihood of success on the merits to warrant preliminary in-junctive relief.

ASSIGNMENTS OF ERROR

Appellant contends that the district court .erred in denying TCSI’s request for preliminary injunction where TCSI established prima facie evidence of Defendants’ violation of the Public Lease Law, and by failing to apply the | judicially created exception- to La. C.C.P. art. 3601, which allows for the issuance of an injunction without the required showing of irreparable injury when the action sought to be enjoined is a violation of a prohibitory law.

STANDARD OF REVIEW

Generally, a trial court’s decision granting or denying a preliminary injunction will not be disturbed absent a clear abuse of discretion. Herman v. City of New Orleans, 2014-0891, p. 4 (La.App. 4 Cir. 01/21/15), 158 So.3d 911, 914 (citation omitted). The trial court’s factual determinations in the granting or denial of preliminary 'injunctions' are subject to the manifest error standard of review. , Jackson v. Pfeifer, 2014-0062, p. 4 (La.App. 4 Cir. 11/12/14), 152 So.3d- 998, 1001 (citations omitted). Under this standard, a reviewing court must not re-weigh the evidence or substitute its own factual findings because it would have decided the case differently. Id. Questions of law, however, are reviewed de novo. Id.; Holly & Smith Architects, Inc. v. St. Helena Congregate *283 Facility, Inc., 2006-0582, p. 9 (La.11/29/06), 943 So.2d 1037, 1045 (quoting Louisiana Mun. Ass’n v. State, 2004-0027, p. 35 (La.1/19/05), 893 So.2d 809, 836). Therefore, if’ this Court finds that the trial court committed legal error, “the manifest error standard becomes inapplicable, and [this Court] must conduct its own de novo review of the record.” Hamp’s Const., L.L.C. v. Housing Authority of New Orleans, 2010-0816, p: 3 (La. App. 4 Cir. 12/1/10), 52 So.3d 970, 973.

DISCUSSION

A petitioner seeking preliminary injunctive relief must establish'that: (1) it will suffer irreparable injury, loss, or damage if the relief is not granted; (2) it is ‘entitled to the relief sought; and (3) it is likely to prevail on the merits of-the case. See La. C.C.P. art. 3601; Smith v. Brum-field, 2013-1171, p. 6 (La.App. 4 Cir. | fiOl/15/14), 133 So.3d 70, 74-75 (citing General Motors Acceptance Corp. v. Daniels, 377 So.2d 346, 348 (La.1979)). Only a prima facie showing that the petitioner will prevail on the merits is required; therefore, the applicant is required to offer less proof than is necessary in an -ordinary proceeding for permanent injunction. Jackson, 2014-0062, p. 5,152 So.3d at 1002 (quoting Burnham Broad. Co. v. .Williams, 629 So.2d 1335, 1338 (La. 4th Cir.1993)).
In accordance with La. R.S. 41:1215(B)(5), TCSI invoked the trial court’s appellate jurisdiction to review the award of the lease.[6] When reviewing decisions of administrative agencies in this manner, trial courts must determine whether the agency acted in a fair and legal manner and not arbitrarily. State Mach. & Equip. Sales, Inc. v. Livingston Parish Gravity Drainage # 5, 1998-1207, p. 5 (La.App. 1 Cir. 06/25/99), 742 So.2d 26, 29 (citing Haüghton Elevator Div. v. State of La. through Div. of Admin., 367 So.2d 1161, 1165 (La.1979)). If the evidence, as reasonably interpreted, supports the agency’s determinations, then the agency’s decisions are accorded great weight and will not bé reversed unless there is a clear showing that the administrative action was arbitrary or capricious. United Healthcare Ins. Co. v. State, 2011-1399, p. 7-8 (La.App. 1 Cir. 9/28/12), 103 So.3d 1095, 1099-1100 (citations omitted). Accordingly, TCSI bore the burdén on its Motion for Preliminary Injunction to make a pr¡ma facie case that Defendants’ decision to award the contract to Carpenter/Woodward was arbitrary or capricious. See La. C.C.P. art. 3601; Smith, 2013-1171, p. 6, 133 So.3d at 74-75 (internal citations omitted). The trial court found that TCSI did not meet this burden. It is |7this finding that we review, under the abuse of discretion .standard, afforded to trial court decisions on preliminary injunctions.
Under Louisiana Public Lease Law, public entities that employ a competitive bidding process are required to accept only the highest bid submitted' to it’ by a person who meets all conditions set forth in the RFP. See La. R.S. 41:1215(A)(1). Louisiana Revised Statute 41:1215(A)(1) provides in pértineht part:
The lessor shall accept only the highest bid ... except in the case where the lessor.is a public benefit corporation as authorized and defined in Subsection B of this Section.
*284 Because Defendant-Appellees failed to award the lease to the highest bidder as required by La. R.S. 41:1215(A)(1), TCSI submits that Appellees directly violated the Public Lease Law.
However, the text of La. R.S. 41:1215(A)(1) explicitly carves out an exception to the “highest bid” requirement for the lease of public property by public benefit corporations.[7] Public benefit corporations are defined by La. R.S. 41:1215(B), in pertinent part, as follows:
“[A] nonprofit corporations” formed pursuant to the general nonprofit corporation law of the state of Louisiana ... by a political subdivision of the [state] through its chief executive officer for the purposes of owning, leasing, developing, and operating properties owned by such political subdivision or by such public benefit corporation, including but not limited to planning, renovating, constructing, leasing, subleasing, managing, and promoting such properties, which activity is declared to constitute a public purpose, and which shall meet each of the following requirements:
[[Image here]]
|r4. Nonprofit corporations which meet the requirements of a public benefit corporation as set forth herein and which own, lease, sublease, or control immovable property shall not be required to advertise for and receive bids as provided for in this Part, provided that any lease or sublease entered into by and between such nonprofit' corporation and a third party be approved by the governing body of such political subdivision on behalf of which the corporation exercises its powers. Such leases or subleases be negotiated and let in accordance with objective criteria relating to a balance of factors including but not limited to highest rent or highest percentage of gross profits, quality control of products, financial stability, architectural design, uniqueness of operation, and overall economic importance to the primary objective of stimulating other industrial or commercial activity within such development;
[[Image here]]
La. R.S. 41:1215(B) (emphasis added).
Further, La. R.S. 41:1212(G) applies to the negotiation of leases by public benefit corporations, and expressly provides as follows:
“Whenever a public benefit corporation formed by the City of New Orleans or Orleans Parish ... for the purposes of owning, leasing, developing, and operating properties owned by the public benefit corporation or the political subdivision, leases any property owned by the public benefit corporation or the political subdivision, such public benefit corporation shall not be required to advertise for and receive bids as provided for in this Part for other leases. Such leases entered into shall provide for a fair and equitable return of revenue to the public benefit corporation or political subdivision.”
La. R.S. 41:1212(G) (emphasis added).
The record reflects that the NOBC is a public benefit corporation as defined in Section 1215(B). Specifically, the NOBC is a nonprofit corporation formed by the City of New Orleans for the purposes of owning, leasing, developing, and [□operating properties owned by the City.[8] *285 Accordingly, the NOBC is neither required to “advertise for and receive bids” as provided in La. R.S. 41:1211 et seq., nor required to accept only the highest bid when awarding leases for property it controls. La. R.S. 41:1215(B); La. R.S. 41:1215(A)(1). Instead, the NOBC is required to negotiate and let property in accordance with objective criteria relating to a balance of factors including but not limited to highest rent or highest percentage of gross profits, quality control of products, financial stability, architectural design, uniqueness of operation, and overall economic importance to the primary objective of stimulating other industrial or commercial activity within such development. La. R.S. 41:1215(B)(4). Additionally, La. R.S. 41:1212(G) requires that any such leases entered into provide for a fair and equitable return of revenue to the public benefit corporation or political subdivision.
According to the RFP, the five finalists were asked to submit detailed response in six categories: (1) Quality of overall proposal; (2) Project characteristics; construction and operational management plan; (3) Quality of financing plan and financial resources; project feasibility; (4) Acceptance of the terms and provisions of a proposed Lease and Parking Agreement; (5) Benefits to the City and NOBC; and (6) Disadvantaged Business Enterprise (“DBE”) Participation. When the Selection Committee met on March 24, 2015 to evaluate the proposals, the City Consultants provided Committee members with a spreadsheet summarizing its analysis of the rental terms, estimated tax payments, and the economic impact of the each developer’s proposal. ■ The affidavit of ImCynthia Connick,.who served as Chairperson of the Selection Committee, states that each Committee member independently assessed and scored each candidate based on these criteria, and each Committee member ranked Carpenter/Woodward’s proposal ás the best.
TCSI, of course, argues that it should have been awarded the lease because it provided “the most lucrative rent proposal.” While it may be true that TCSI’s proposal offered the highest projected fixed rental payments, rent alone was not the sole criteria considered by the Selection Committee. The City Consultants provided the Committee with data evidencing that the City would see the biggest economic benefit, over the term of the lease, from the Carpenter/Woodward proposal considering factors such as construction cost and tax revenue, in addition to the fixed rental payments.
Moreover, the Committee members’ scoring sheets, identified several concerns with TCSI’s proposal that touch on many of. the criteria identified in the RFP. For one, at least three. Committee members noted concerns with regard to TCSI’s financing plan and the project’s financial feasibility, because TCSI failed to provide information from a financial institution evidencing availability of funds. Secondly, TCSI proposed to use land adjacent to but outside the leased premises, property now occupied by the Algiers - Ferry terminal, for an attraction it stipulated as a major source of rental revenue. However, TCSI provided no evidence of the third-party commitments necessary to substantially rely on this revenue stream, and numerous Committee members noted their concern over the speculative nature of this portion of TCSI’s proposal. Also, TCSI’s proposed hotel operator, the Valencia Group, planned to operate the hotel under a new brand of hotel, a Hotel Alessandra. At the time TCSI submitted its RFP, there were *286 no hotels, anywhere, In operating under that brand. Comparatively, Carpenter/Woodward’s submission contained a proposal from Four Seasons Hotels and Resorts to transform the WTC site into a hotpl, which would be the brand’s 95th worldwide. Committee members consistently .remarked on the strong reputation of the Four Seasons, ultimately concluding that the Four Seasons brand was more likely to succeed over the term of the lease.[9]
As the foregoing discussion demonstrates, the record is rife with evidence that .the NOBC through the Selection Committee reasonably assessed the submissions based on the criteria set forth in the RFP, and in accordance with the exception provided for in Section 1215(B). The record also suggests that, as required by La. R.S. 41:1212(G), the Lease Agreement with Carpenter/Woodward provides a fair and equitable return of revenue tó the City. It was TCSI’s burden on its Motion for Preliminary Injunction to make a prima facie showing that NOBC’s decision was arbitrary and capricious. State Mach. & Equip. Sales, 1998-1207, p. 6, 742 So.2d at 29; Smith, 2013-1171, p. 6, 133 So.3d at 74-75 (citations omitted). For the foregoing reasons, we cannot find that the trial court abused its discretion in finding that TCSI did not carry its burden.
In a final effort to discredit Defendants’ reliance on the exception defined in Section 1215(B), TCSI argues that the NOBC was a “straw man” for the City in that the City used the NOBC’s status as a public benefit corporation to circumvent Public Lease' Law, Specifically, TCSI contends that as a party to the RFQ,'RFP, the Lease Agreement, and the contract retaining Stone Pigman, the City cannot invoke the exception for public benefit corporation, and must abide by paragraph lia(A) of La. R.S. 41:1215, which, "again, would require the NOBC to award the Lease to the “highest bidder,” TCSI points to the fact that the Selection Committee was comprised of City employees as additional evidence of'this reality.
However, the principles of statutory interpretation recognize that “[wjhen the written law is clear and unambiguous, and its application leads to no absurd consequences, the law shall be applied as written.” Hamp’s Constr., 2005-0489, p. 9, 924 So.2d at 110 (citation omitted). Both Section 1215(B)(4) and 1212(G) contemplate situations in which a public benefit corporation, as defined by Section 1215(B), lease property owned by the corporation or the political subdivision on behalf of which the corporation exercises its powers. It is uncontroverted that NOBC qualifies as a public benefit corporation. In contending that " the City was a party to the RFQ, RFP, and the Lease, TCSI argues that the City and not the NOBC is the actual lessor of the property, thereby excluding reliance on the exemption to the “highest bid” requirement carved out in Section 1215(B). However, the express terms of the lease evidences that the NOBC is, in fact, the lessor of the property in question. The Lease expressly defines the NOBC as the “Landlord,” and all deposits and rental payments under the Lease flow to the NOBC as Landlord. The City signed the Lease as “intervenor,” but we find no authority that such action invalidates the process as TCSI contends.
Similarly, we find no authority that invalidates the award because City employees were members of the Selection Committee. Sections 1215(B)(4) and 1212(G) do not call for a specific process by which *287 public benefit corporations can solicit bids or evaluate submissions. Moreover, the record reflects that the Selection Committee merely scored the submissions, and recommended a winning bid based on their evaluations. -Pursuant to Section 1215(B)(4), the NOBC Board |iaand City Council were required to and did approve the award of the lease to Carpenter/Woodward. Based on the foregoing, we affirm the trial court’s determination that the City’s involvement in the bid procurement process did not invalidate the award of the lease to Carpenter/Woodward.
TCSI separately takes exception to the trial court’s applicátion of the irreparable harm element to their request for preliminary injunctive relief. TCSI claims that “[a] showing of irreparable injury is not necessary ... when the conduct sought to be restrained is unconstitutional or unlawful, ie.,-when the conduct sought to be enjoined constitutes a direct violation of prohibitory law and/or violation of a constitutional right.” Barlow v. Town of Waterproof, 45,211, p. 7 (La.App. 3 Cir. 5/19/10), 39 So.3d 768, 773 (citing Jurisich v. Jenkins, 199-0076 (La.10/19/99), 749 So.2d 597.). This contention is based on the premise that Defendants’-violated Louisiana Public Lease Law by not awarding the Lease to the highest bidder, thereby eliminating the need for TCSI to prove irreparable harm as typically required when seeking preliminary injunctive relief.
However, as discussed above,' the NOBC did not violate Public Lease Law by awarding the lease to Carpenter/Woodward. The NOBC is a public benefit corporation as defined in Section 1215(B), and is expressly exempt from the “highest bidder” requirement set forth in Section 1215(A)(1). Further, the jurisprudence makes clear that only direct violations of a prohibitory law may be enjoined without a showing of irreparable harm, See Broadm-oor, L.L.C. v. Ernest N. Mortal New Orleans Exhibition Hall Authority, 2004-0211, p. 6 (La.3/18/04), 867 So.2d 651, 656 (citing La. Associated Gen. Contr., Inc. v. Calcasieu Parish School Bd., 586 So.2d 1354, 1357 (La.1991)). Courts have found this prerequisite satisfied only when there has been a clear violation of express law, not cases of 114arguable violations. Hobbs v. Gorman, 595 So.2d 1264, 1266 (La. 4th Cir.1992) (citing New Orleans Public Service Inc. v. City Council of the City of New Orleans, 539 So.2d 891, 893 (La. 4th Cir. 1989)). Given the -balancing of factors and consideration of equities required of public benefit corporations when awarding leases as set forth in Sections 1215(B)(4) and 1212(G), it is impossible to say at this juncture that the NOBC directly violated these statutes by awarding the lease to Carpenter/Woodward. Great discretion is afforded to decisions . of administrative agencies in these circumstances. See State Mach. & Equip. Sales, 1998-1207, p. 6, 742 So.2d at 29 (citing Haughton Elevator Div., 367 So.2d at 1165).
Consequently, in seeking its preliminary injunction, TCSI was required to show that it will suffer irreparable loss, damage, or injury if the preliminary injunction is not issued. In order to prove irreparable injury, the petitioning party must show that the injuries suffered cannot be adequately compensated by money damages, nor measured by pecuniary standards. Smith, 2013-1171, p. 7, 133 So.3d at 75 (quoting Historic Restoration, Inc. v. RSUI Indem. Co., 2006-1178, p. 11 (L& App. 4 Cir. 3/21/07), 955 So.2d 200, 208). The only harm alleged below by TCSI is that absent a preliminary injunction it would suffer “the loss of its business reputation.” Loss of business reputation is compensable by damages, therefore it is not a harm properly addressed through injunctive relief. Ellis Const., Inc. v. *288 Vieux Carre Resort Properties, L.L.C., 2005-1109, p. 9-10 (La.App. 4 Cir. 6/7/06), 934 So.2d 206,213.
Moreover, in analyzing irreparable harm, courts should consider whether the threatened harm to the plaintiff outweighs the potential harm to the defendant and potential disservice to the public interest. Historie Restoration, Inc. v. RSUI Indem. Co., 2006-1178, p. 11-12 (La.App. 4 Cir. 3/21/07), 955 So.2d 200, 208. Not only is the alleged “loss of business reputation” not properly addressed through in-junctive relief, but the potential harm to both Carpenter/Woodward and the public interest far outweighs TCSI’s concerns. As noted in the affidavit of the President and CEO of Woodward, uncertainty created by an injunction at this stage could result in hesitation among the project’s lenders and investors, which, in turn, could materially alter the economics of the project as a whole. A potential delay in this development continues to allow an enormous public asset to lie dormant and not generate any revenue for the City.
For the foregoing reasons, we find that the trial court did not abuse its discretion in finding that TCSI did not establish irreparable harm as is required of a petitioner seeking a preliminary injunction.

DECREE

For the reasons cited herein, we affirm the trial court’s denial of TCSI’s Motion ■ for Preliminary Injunction.
AFFIRMED

, The NOBC’s Articles of Incorporation state that the NOBC is "formed as a ‘public benefit corporation' as such term is defined in LAR.S. 41:1215(B) for the purposes of leasing, developing, and operating properties owned by the City of New Orleans or the Corpora- • tion.” The Mayor, in his official capacity, is the sole authorized shareholder of the NOBC.

, In order the assist the City, and the Selection Committee, in its evaluation of proposals that were received, the NOBC engaged Stone Pigman Walther Wittman law firm ("Stone Pigman”) who, in turn, retained JLL Hotels and Hospitality Group ("JLL”), an international financial and professional services firm (collectively, the "City Consultants”).

, This phase of the bidding process is called a "Request for Proposals" (RFP).

.The RFP provided as follows:
After the Proposal Presentations and any requested supplemental information has been reviewed, NOBC may begin preliminary negotiations with the RFP Respondents. During these preliminary negotiations and prior to any recommendation, the selection committee'expects to ask for a “Best and Final” offer/proposal from the RFP Respondents. - The selection committee will make a recommendation to the NOBC Board of Directors to enter into an exclusive right to finalize the Lease and Development Agreement or similar documents) with one of the RFP Respondents based upon the "Best and Final” proposal.

. La. R.S. 41:1211, et seq., including Section 1215, provides the procedural considerations for the leasing of public lands.

. La. R.S. 41:1215(B)(5) provides that “[i]n the event that any person or other entity be unsuccessful in the bid for the lease or sublease of immovable property owned, leased or controlled by a public benefit corporation such person or other entity may, not later than thirty days following the occurrence of such event, appeal to the district court in which the political subdivision is located for such relief as may be provided by law.”

. See supra, note 8.

. See supra, note 1 ("The NOBC’s Articles of Incorporation state that the NOBC is formed as a ‘public benefit corporation' as such term is defined in LA-R.S, 41:1215(B) for the purposes of leasing, developing, and operating *285 properties owned by the City of New Orleans or the Corporation.”).

. Even TCSI’s submission to the City acknowledged that the Four Seasons is “lauded for having one of the lowest turnover rates in the industry,”