YOLANDE SCHEXNAYDER & SON, INC.

VERSUS

PARISH OF ST. JAMES

NO. 21-CA-416

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA


ON APPEAL FROM THE TWENTY-THIRD JUDICIAL DISTRICT COURT
PARISH OF ST. JAMES, STATE OF LOUISIANA
NO. 40,298, DIVISION "E"
HONORABLE ALVIN TURNER, JR., JUDGE PRESIDING


March 09, 2022


**FREDERICKA HOMBERG WICKER**
**JUDGE**


Panel composed of Judges Fredericka Homberg Wicker,
Marc E. Johnson, and John J. Molaison, Jr.


<u>**REVERSED**</u>
    **FHW**
    **JJM**

<u>**JOHNSON,J., CONCURS WITH REASONS**</u>
    **MEJ**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Alexis Barteet
Deputy, Clerk of Court

COUNSEL FOR DEFENDANT/APPELLANT,
ST. JAMES PARISH
    Victor J. Franckiewicz, Jr.
    W. Peter Connick, Jr.

COUNSEL FOR INTERVENOR/APPELLEE,
ST. JAMES CONSTRUCTION MATERIALS, LLC
    Robert J. Stefani, Jr.
    Patrick T. Isacks

**WICKER, J.**

This litigation arises out of a land use dispute involving a large, 371-acre tract of land in St. James Parish referred to as the "Big Shake Pit." St. James Parish seeks review of the trial court's April 7, 2021 granting of a preliminary injunction, enjoining St. James Parish from requiring "prior approval" to "excavate, sell and deliver up to 9 million cubic yards of clay material for U.S. Army Corps of Engineer levee projects or for the use of any necessary utilities or equipment, including electrical or water services" and, further, enjoining it from taking any action to prevent such use, including the refusal to issue permits. The landowner contends that the operation of a borrow pit and the related excavation on the property is a permitted "nonconforming use" as defined in the Parish's Land Use Plan (St. James Parish, LA, Code of Ordinances, § 82-25 (2014)) and thus is permissible on the property now designated for agricultural and residential use.

Upon our review, we find that the Parish's Land Use Plan and pertinent law instructs that the preliminary factual determination as to whether the property at issue meets the definition of a nonconformity under the Parish ordinance falls within the jurisdiction and purview of the local governing authority, St. James Parish. We further find that the trial judge abused his discretion in issuing a preliminary injunction in this matter where the petitioning party failed to prove that the injunction would serve to maintain the status quo between the parties. For the following reasons, we reverse the trial court's April 7, 2021 judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 9, 2021, Yolande Schexnayder & Son, Inc. (YSS) filed a "Petition for Declaratory Judgment, Injunctive Relief, and Damages and Application for Preliminary Judgment" in the Twenty-Third Judicial District Court for the Parish of St. James. In its Petition, YSS asserted that "[t]his dispute arises out of St. James Parish's unjustified refusal to issue permits for electrical, water, or

any other utilities or work on the Property." YSS sought a judgment declaring that the property at issue "enjoys the status of a legal nonconforming use and that such use can lawfully continue without the need for approval of the planning commission or Parish Council of the Parish of St. James." YSS further sought damages for the "Parish's refusal to acknowledge and recognize such status of the Property as required by law." Additionally, YSS prayed for injunctive relief under La. C.C.P. art. 3601 "to permit reasonable and continued use and operation of the Property as a commercial borrow pit consistent with its past use and operation as such pending a final trial on the merits to prevent immediate and irreparable harm to YSS."

On March 8, 2021, St. James Construction Materials, LLC (SJCM) filed a Petition for Intervention, claiming that it is the owner of the property at issue and thus has a justiciable interest in the proceedings. SJCM asserted that its interests are aligned with YSS and further sought similar declaratory and injunctive relief in its petition, including relief to enjoin the Parish from prohibiting SJCM to "excavate, sell and deliver up to 9 million cubic yards of clay material for U.S. Army Corps of Engineer levee projects or for the use of any necessary utilities or equipment, including electrical or water services."[1]

On March 23, 2021, the trial court conducted a hearing on the preliminary injunction. At the hearing, various witnesses testified concerning the operation of "Big Shake Pit" as a borrow pit during various time periods.

Jay Thomas, a representative with Louisiana Earth Corporation (LEC), testified that following Hurricane Katrina, LEC learned of opportunities related to rebuilding the levee system from Plaquemines Parish to Saint James Parish. LEC

---

[1] On March 22, 2021, the Parish filed an exception of no right of action, asserting that YSS has no right of action to bring suit because it sold the property at issue in December 2020. The record reflects that hearing was set for June 1, 2021, but the judgment on that exception is not in the record nor is it before this Court.

and YSS entered into an agreement that LEC would have the right to dig for heavy clay material on the property, with YSS reserving the right to the topsoil material, to sell for use in the post-Katrina U.S. Army Corps of Engineers Project. To be able to contract for the levee project, LEC took on a costly process of obtaining certification for the clay material to be certified for use with a U.S. Army Corps of Engineers levee project. He further testified that such levee construction projects are "long-term" in nature, requiring a $690,000.00 investment to obtain certification and a long-term bidding process. He testified that the actual digging for the post-Katrina levee project did not occur until approximately 2011. He testified that digging occurred for that project in the northwest quadrant of the property, which resulted in holes or "cells" on the property.

Mr. Thomas testified that when SJCM purchased the property in 2020, SJCM required, as a part of the purchase, that LEC obtain paperwork for the West Lakeshore Lake Pontchartrain Levee Project. He testified that LEC began preparing the property for the West Lakeshore Project in 2011, when they discovered that the project would be "coming down the line." He testified that an LEC representative has attended the Pontchartrain Levee District Meetings, with a YSS representative present, since that approximate 2011-2012 time frame. The West Lakeshore Project was very close in proximity to the Big Shake Pit property, which made the project more lucrative with lower costs to transport the clay.

Mr. Thomas testified that between 2007 and 2012 or 2013, he was physically present at the property approximately three times per week. He testified that during that time he regularly observed people digging at the property. Thereafter, during the time period from 2013 to 2020, he testified that he, on average, visited the property bimonthly or quarterly. His attorney would conduct site maintenance inspections or drive by the property almost every weekend, on his way to his fishing camp. He testified that there was never a six-month period

between 2013 and 2020 when he did not visit the property and observe "digging or maintenance work" of some kind being performed on the property. Mr. Thomas explained that the property has a large sign labeled "Big Shake Property" with his contact information and that although the property is also used as a sugarcane field, that use is not to the exclusion of the property's primary use as a commercial borrow pit.

Mr. Thomas testified to his understanding that Quiver Construction, owned and operated by Bryan Schexnayder, had an agreement with YSS that Quiver would be able to mine the surface material or topsoil, which is required to first be removed before one can dig for and reach the heavy clay material underground. However, Mr. Thomas also testified unequivocally that no clay mining of any heavy clay material took place in the years 2014 through 2020.

Mr. Thomas also testified to the fact that SJMC's reputation and business would suffer irreparable harm if they were not permitted to participate in the West Lakeshore Project. He also acknowledged, however, that LEC did not maintain a St. James Parish business operating license until the year 2020 and that LEC contracted with a third-party to operate the pit in 2011-2012 when heavy clay mining took place.

Stephen Cali, a civil engineer contractor, testified that he has been an engineer and advisor on the Big Shake Pit property since 2008. He testified that he continuously monitors the Corps of Engineers' procurements for dirt, markets Big Shake Pit to contractors and engineers he knows in the business, and ensures that all paperwork and permits are up to date. Mr. Cali testified that, after the post-Katrina levee project was completed in 2013, "there was a lull" in large projects on the property. Mr. Cali testified that he was aware of the West Lakeshore Project and he was "constantly monitoring it" and always keeping the property in a "state of readiness," meaning keeping the roads maintained and the land clear. He

testified that the funding for the Corps of Engineers to move forward with the West Lakeshore project was not approved until 2017-2018.

At the preliminary injunction hearing, the Parish introduced into evidence the affidavit of Glenn Waguespack, the St. James Tax Assessor, who attested that the property at issue was assessed for "Use Value." Mr. Waguespack attested that for the years 2010-2012, the property was designated as Use Value, either agricultural or marsh land. For the years 2013-2021, with the exception of 55 acres classified as batture lands, the entirety of the property was designated as Use Value, either as agricultural or timber use. He further attested that a property owner is required to notify the St. James Assessor Office if a property no longer qualifies for a designated use for tax purposes. He attested that his search reflects that no notification has ever been filed to change the designation for tax purposes of the Big Shake property.

Laddie Rousell testified that he has lived next to the Big Shake Pit since 2005. He testified that he recalls clay mining taking place in approximately 2010 and 2011. He testified that the "cells" or holes in the northwest quadrant of the property were filled with water and vegetation by 2012, and that all of the mining equipment was removed from the property by that time. Mr. Rousell testified that he observed two people with Quiver Construction digging for topsoil in late 2014 into early 2015 and specified that he has not seen any digging for topsoil or any clay materials in 2020.[2]

Mr. Rousell testified that he developed a subdivision nearby, which took place in three separate phases. He testified that he was aware of the St. James Parish new Land Use Plan, and that such plan factored into his decision to move

---

[2] SJCM introduced into evidence the affidavit of Bryan Schexnayder with Quiver Construction, who attested that Quiver continuously mined for topsoil on the property from 2013 to the date of the sale of the property in December 2020. He testified that the activity was continuous but contingent on the demand for soil and various weather conditions.

forward with a residential subdivision in that area. He testified that he was required to obtain permitting for each phase and that his most recent subdivision is adjacent to the property at issue and is a small seven-lot family subdivision with a children's playground or playset area incorporated into the subdivision.

At the conclusion of the hearing, the trial judge took the matter under advisement. On April 7, 2021, the trial judge issued a judgment, granting SJCM's application for preliminary injunction and enjoining St. James Parish from requiring "prior approval" for the "entirety of the 371-acre property" to "excavate, sell and deliver up to 9 million cubic yards of clay material for U.S. Army Corps of Engineers levee projects or for the use of any necessary utilities or equipment, including electrical or water services, backhoes, bulldozers/graders, dragline/excavators, both tracked or wheeled vehicles, scales, trailers or fuel tanks in connection with such use…" and, further, enjoining it from taking any action to prevent such use, including the refusal to issue permits. The trial judge issued written reasons finding that "from 2013 until the sale of the property to SJCM there was continuous mining and sale of surface clay material, sometimes referred to as topsoil, as well as other site maintenance activities." The trial judge found that the activities were continuous and thereafter were never abandoned, ceased, or interrupted for any period longer than six months. The trial court thus found that the property was used as a borrow pit prior to the enactment of the Land Use Plan at issue and, thus, was a nonconforming use "grandfathered in" and that any use in connection with excavation or operating the land as a borrow pit would not require prior Parish approval.

The trial judge considered the language of the land use ordinance at issue and found that a property that qualified as a nonconforming use under subsection (k) of the ordinance does not require Parish approval for any use, including addition of utilities such as water or electrical or addition of structures such as

trailers or fuel tanks. The trial judge found that because a borrow pit is a unique property with a limited "capacity" for heavy clay material, such additions did not increase the "capacity" of the property as referenced in the ordinance and, thus, prior Parish approval was not required.

The Parish appealed the trial court's April 7, 2021 preliminary injunction. On appeal, the Parish first contends that the trial court erred in finding that SJCM proved continuous "physical use" of the land as a borrow pit consistent with excavation and mining with no interruption of such activity for any six-month period. Second, the Parish contends that the trial court misinterpreted subsection (k) of the applicable St. James Parish ordinance defining a non-conforming use and improperly determined that the nonconformity subsection serves as a blanket exemption from other provisions of the ordinance requiring prior Parish approval for certain uses. Finally, the Parish contends that the trial court impermissibly substituted its judgment for that of the Parish, where the law commits land use regulation first to the province of local government.

For the following reasons, we find that the Parish's assignment of error concerning interpretation of the Parish ordinance has merit and we find that, under the facts of this case, SJCM must first seek Parish approval for the use or actions it sought approval for in its application for preliminary injunction. Consequently, because the judgment appealed specifically finds that prior Parish approval is unnecessary and further enjoins the Parish from considering whether the property at issue is a nonconformity under the ordinance, we reverse the trial court's April 7, 2021 judgment.

**DISCUSSION**

On appeal, the Parish contends that the trial court misinterpreted Section 82-25(k) within the Parish's Land Use Plan, titled "Nonconformities," to hold that any nonconforming use under the ordinance does not require prior Parish approval

when required under other subsections of the ordinance.[3]  The Parish argues that the trial court's interpretation of the ordinance results in "a blanket exemption" for nonconformities to engage in any activity or use, including connection of utilities and addition of structures previously not existing, without Parish approval when generally required under the ordinance's other provisions.

For the following reasons, we find that, in addition to circumstances when the use at issue may be considered an "expanded use" under subsection (k), the Parish ordinance sets forth that prior parish approval through the permit process is required for any use, whether a conforming or nonconforming use, if a land is large enough (more than 3 acres) or if the use is impactful enough (requiring state or federal permits) under subsection (f) of the ordinance.  Further, we find that subsection (k)(6)—which requires a landowner seeking to maintain a nonconforming use status on a property to file an annual report with the Parish— reflects the Parish's intent to require at least an annual review of the property's use to ensure that its current use still meets the definition of a nonconformity under the Land Use Plan.  We further find this provision reflects generally the Parish's intent in its Land Use Plan to exercise its power to enforce the plan and to make the preliminary factual determination as to whether a parish property is entitled to nonconforming use status.

The general authority for local government to regulate land use is conferred by La. Const. Art. 6, § 17, which provides in part:

> Subject to uniform procedures established by law, a local governmental subdivision may (1) adopt regulations for land use, zoning, and historic preservation, which authority is declared to be a public purpose; (2) create commissions and districts to implement those regulations; (3) review decisions of any such commission; and (4) adopt standards for use, construction, demolition, and modification of areas and structures.

---

[3] Because we find that this assignment of error has merit requiring reversal of the trial court judgment and renders moot the remaining assignment of error, we address the Parish's assignment of error concerning interpretation of the ordinance and pretermit discussion of the remaining assignments of error.

*K.G.T. Holdings, LLC v. Par. of Jefferson*, 14-872 (La. App. 5 Cir. 3/25/15), 169 So. 3d 628, 631, *writ denied*, 15-0810 (La. 6/19/15), 172 So.3d 652.

Land use is subject to the police power of various governing bodies, and the courts will not interfere with the decisions of these bodies unless it is clear that their action is without any relation to the public health, safety, or general welfare. *Id; see also Garber v. City of New Orleans Through City Plan. Comm'n,* 16-1298 (La. App. 4 Cir. 12/13/17), 234 So.3d 992, 996–97*, writ denied sub nom. Garber v. City of New Orleans,* 18-0351 (La. 4/20/18), 240 So.3d 924; *Palermo Land Co., Inc. v. Planning Com'n of Calcasieu Parish*, 561 So.2d 482, 491 (La. 1990).

The proper interpretation of the language of a statute or Parish ordinance is a question of law requiring *de novo* review. *City of Gretna v. Morice*, 14-301 (La. App. 5 Cir. 12/30/14), 167 So.3d 823, 827; see also *Normand v. 1st Lake Realty, Inc.*, 12-797 (La. App. 5 Cir. 5/23/13), 119 So.3d 610, 613, *writ denied*, 2013-1482 (La. 10/4/13), 122 So.3d 1020. The statutory and jurisprudential rules for statutory construction and interpretation apply equally well to ordinances, rules, and regulations. *Landry v. E. Baton Rouge Par. Sheriff's Off.*, 14-0733 (La. App. 1 Cir. 3/9/15), *writ granted*, 15-681 (La. 6/30/15), 168 So.3d 378.

When a statute is clear and unambiguous and the application of the statute does not lead to absurd consequences, the statute must be applied as written. *Smith v. St. Charles Par. Pub. Sch.*, 17-475 (La. App. 5 Cir. 5/1/18), 246 So.3d 821, 826, *writ denied*, 18-1001 (La. 10/8/18), 253 So.3d 802. However, where a literal interpretation would produce absurd consequences, the statute must be construed so as to produce a reasonable result. *O'Brien v. Shepley,* 451 So.2d 82, 84 (La. Ct. App. 5th Cir. 1984).

Moreover, where it is possible, courts have a duty in the interpretation of a law to adopt a construction which harmonizes and reconciles it with other

provisions dealing with the same subject matter. *Par. of Jefferson v. Kennedy*, 09-145 (La. App. 5 Cir. 10/27/09), 28 So.3d 301, 303. "All laws pertaining to the same subject matter must be interpreted *in para materia*." *Acurio v. Acurio*, 2016-1395 (La. 5/3/17), 224 So. 3d 935, 938, quoting *Pierce Foundations, Inc. v. Jaroy Construction, Inc.*, 15-785 (La. 5/3/16), 190 So.3d 298, 303. When interpreting the law, the starting point is the language of the written law itself. *Dejoie v. Medley*, 08-2223 (La. 5/5/09), 9 So.3d 826, 829.

The ordinance at issue is a part of the Parish's Land Use Plan, St. James Parish, LA, Code of Ordinances, § 82-85. Subsection (b) of the ordinance provides that the Land Use Plan is a "master plan" as that term is used in R.S. 33:109 and 33:109.1 and further that it is "the intention of the parish that all local, regional, state, and federal entities operating in or making decisions affecting property in the parish comply with the land use plan to the maximum extent allowable under law." Subsection (d) of the ordinance concerns allowable uses as set forth in the Land Use Plan and provides that such allowable uses "shall be permitted as a matter of course through the parish's customary building permit process under chapter 18, subject to compliance with other applicable ordinance requirements, and except as otherwise provided in this section."

Subsection (f), in pertinent part, provides:

> Notwithstanding subsection (d) of this section [concerning allowable uses], the following uses or activities shall not be issued a building permit until approved by the planning commission (or by the parish council on appeal):
>
> (1) Any residential building containing three or more dwelling units.
> (2) Any nonresidential development exceeding 10,000 square feet of building area or sites three acres or more.
> (3) Any commercial or industrial development that requires a state or federal permit for air, water, solid waste, hazardous materials, or section 404 Wetland/Rivers and Harbors Act permits.

The planning commission shall act on the proposal under this subsection, and such decision shall be final unless it is appealed. Any person aggrieved by the planning commission's decision under this subsection may appeal to the parish council in writing within 30 days of the planning commission's decision. The parish council shall take up the appeal as soon as is practical following the written notice of appeal to the parish council, and shall do so in accordance with the requirement of the state Open Meetings Law, R.S. 42:11 et seq. The parish council, in its discretion, may consider the appeal on the basis of the written record of the matter, or may convene a hearing concerning the appeal.

The following subsection (subsection (g)) in part provides that even "[u]ses or activities that do not require action by the planning commission (including those covered by section 18-38(1)) *shall be applied for* and considered through the parish's building permit process under chapter 18." (emphasis added).

Subsection (k) titled, "Nonconformities" provides:

*(k) Nonconformities.*

(1) *Description.* A use of land existing as of the effective date of the ordinance from which this section is derived and which would not constitute an allowable use under subsection (c) of this section shall be considered a nonconformity.

(2) *Intention.* It is the intention of this section to allow nonconformities to continue until they are voluntarily closed or removed, but not to encourage their survival or expansion.

(3) *Maintenance, safety, and environmental protection.* It is also the intention of this section to allow nonconformities to perform routine maintenance, and to allow improvements limited to improving safety conditions and environmental protection without being treated as a new use under this section.

(4) *Loss of nonconforming status.* A nonconformity that discontinues operation or use for more than six continuous months shall lose its status as a nonconformity, and shall thereafter be treated as a new use subject to the provisions of this section. Failure to maintain a reasonable level of employment compatible with the historic operation of a nonconformity shall be deemed to be a discontinuation of operations. The mere presence of security personnel at a nonconformity shall not be deemed to be a continuation of operations. The burden of proving that a nonconformity is continuing or has continued operations shall be borne by the owner, operator, or similarly situated person responsible for the nonconformity.

(5) *Expansions.* Any expansion of capacity or enlargement of physical facilities that would support the future expansion of capacity shall be considered as a new use subject to the provisions of this section.

(6) *Reporting.* For a nonconformity to retain its status as such, the owner, operator, or similarly situated person responsible for the nonconformity must timely submit an annual Tier 2 report pursuant to

the Right-to-Know Law (R.S. 30:2361 et seq .). Submission of this report to the parish office of homeland security and emergency preparedness shall satisfy this requirement. Such submissions shall be made available to the parish department of operations, planning and permitting office to allow for verification of the nonconformity's status. If a nonconformity is not required to report under the Right-to-Know Law (R.S. 30:2361 et seq .), the owner, operator, or similarly situated person responsible for the nonconformity must furnish a copy of one or more of the following reports to the parish department of operations, planning and permitting office within 30 days of submitting the report to the responsible public agency:

a. Its annual toxic chemical release inventory report submitted under section 313 of the Emergency Planning and Community Right-to-Know Act of 1986 (42 U.S.C. 11023);

b. Its discharge monitoring report (DMR) submitted under the Louisiana Pollution Discharge and Elimination System. For those uses whose DMR is submitted annually, the annual report shall satisfy this requirement. For those uses that submit DMRs more frequently than annually, the reports for an entire calendar year may be submitted to the parish at one time within 30 days of the last DMR submitted for the calendar year, or the DMRs may be submitted to the parish incrementally; or

c. *Such other report approved in writing by the parish president as providing information about ongoing operations similar to the reports described in subsections (k)(6)a and b of this section.* (Emphasis added).

Upon our *de novo* review of the ordinance, we find that the directions set forth in subsection (f) require Parish approval for any permitting for a property three acres or larger or any property that requires other state or federal permits for its operation. The Big Shake property at issue is 371 acres and, thus, is a tract of land three-acres or larger as stated in subsection (f)(2).[4]

The trial court found that subsection (f) does not apply to a property with nonconforming use status because subsection (f) qualifies that it applies "notwithstanding subsection (d)" but does not specifically say notwithstanding subsection (k). Subsection (d) discusses uses that conform with the designation provided in the Land Use Plan. Therefore, if the landowner of a piece of land that is three acres or larger and is designated agricultural seeks to use or operate the

---

[4] It is unclear whether the property would be required to seek parish approval under subsection (f)(3).

land in conformity with its designation (agricultural use), subsection (f) instructs that the landowner or operator must obtain parish approval for any use, even though its use is in conformity with the Land Use Plan's designation. If we apply the ordinance as interpreted by the trial court, however, a landowner or operator of a piece of property three acres or larger that is designated agricultural but seeks to continue to use the property for an industrial or other nonconforming use, would not have to seek parish approval to operate in a manner not in conformity with the land use designation and, thus, would be subject to less governmental review than a property in use as designated pursuant to the Land Use Plan. We find this interpretation leads to absurd results and does not reasonably comport with the Parish's intent set forth in the Land Use Plan.

We find a review of subsection (k)(6), which requires a landowner or operator who seeks to establish or maintain nonconformity status to file an annual "*report approved in writing by the parish president as providing information about ongoing operations….*" further supports this interpretation. We find this provision within the ordinance clearly sets forth the Parish's intent to annually and consistently review properties with alleged nonconforming use status, regardless of the size of the land, to ensure that its use is in compliance with the Parish's Land Use Plan. The intent of the parish through the ordinance is clear that the Parish reserves the right to annually make the preliminary factual determination as to whether a use is a nonconforming use, an expansion of a former use, or a new use as defined under subsection (k).[5] Accordingly, upon our *de novo* review, we find that under the facts of this case the trial court erred in its judgment holding that SJCM is not required to first seek Parish approval to obtain permits and to "excavate, sell and deliver 9 million cubic yards of clay…. ."

---

[5] Based upon the record before us, it does not appear that YSS, SJCM, or any other operator of the property at issue filed any annual report with the Parish as required under the ordinance.

We further point out that the record before us lacks any evidence to show that YSS or SJCM sought any permit approval from the Parish for any use of the property at issue.[6] Moreover, the record lacks evidence of any permit denial, planning commission decision, or other administrative decision from the Parish for review. The Parish recently submitted correspondence to this Court pointing this court to additional case law to consider in connection with its appeal, specifically *New Cingular Wireless, PCS, LLC v. City-Parish of East Baton Rouge*, No. 2021 CA 0292, 2021 WL 6331379, La. App. 1 Cir. (12/30/21). The Parish asserted that the *New Cingular Wireless* case supports its position "that great deference is due to the Parish's interpretation of its land use ordinance." Moreover, SJCM on appeal contends that "the Trial Court was under no obligation to "rubber stamp" the Parish's position, which itself represented an abrupt reversal of the Parish's endorsement of Big Shake's use as a borrow pit only four months previously." Although both parties present arguments on appeal as to whether deference is owed to the local governing authority's decisions or actions in land use matters, neither party introduced into any evidence any documentation to show denial of the referenced utility permits or any other administrative Parish decision or determination as to the Property's use.[7][8]

---

[6] To the contrary, at the hearing, SJCM introduced into evidence September 8, 2020 correspondence from Marrill McKarry, the Deputy Director of the Department of Planning and Development for St. James Parish, to Stephen Cali stating that the "St. James Parish Coastal Management Committee has no objection" to the Coastal Use Permit application it had submitted to the State. However, the letter further stated that it should not be "interpreted in any manner which would create any liability on the President and Council of St. James…and…additional permits or assurances may be required from other state or federal agencies."

[7] Although the record contains an email from the Parish's attorney to opposing counsel concerning water and electrical permits and a concern of how to "get around" the ordinance's restrictions on nonconformities, counsel also indicated he would "look at this in more depth and see if anything can be done." We cannot find this email constitutes a decision, action, or determination on behalf of the Parish.

[8] The trial court, when reviewing the denial of a permit or other land use decision, must review the decision to determine if the landowner met its burden to prove that the governmental entity which denied the permit acted in an arbitrary and capricious manner. *King v. Caddo Parish Com'n,* 97–1873 (La. 1998), 719 So.2d 410; Church v. St. Charles Par., 00-185 (La. App. 5 Cir. 8/29/00), 767 So.2d 913, 916–17, *writ denied*, 00-2727 (La. 11/27/00), 775 So.2d 450. Without a permit denial or other determination or decision from the Parish concerning this property, the trial court could not apply a proper standard of review.

Upon our review of the record, we further find that the trial judge abused his discretion in issuing the preliminary injunction based upon the testimony and the evidence presented at trial. A writ of preliminary injunction is essentially an interlocutory order issued in a summary proceeding incidental to the main demand for permanent injunctive relief. It is designed to and serves the purpose of preventing irreparable harm by preserving the status quo between the parties pending a determination on the merits of the controversy. *Bank One, Nat. Ass'n v. Velten*, 04-2001 (La. App. 4 Cir. 8/17/05), 917 So.2d 454, 458, *writ denied*, 06-0040 (La. 4/28/06), 927 So.2d 283; *Bally's Louisiana, Inc. v. Louisiana Gaming Control Board,* 99–2617, p. 7 (La. App. 1 Cir. 1/31/01), 807 So.2d 257, 263.

Notwithstanding the ultimate question of whether SJCM's proposed use of the land constitutes a nonconformity under the Parish ordinance—upon which we do not opine—we find that the actions enjoined within the preliminary injunction in this case do not maintain the status quo between the parties. Specifically, the evidence presented at the injunction hearing did not establish that any utilities were previously present at the property or, further, that heavy clay mining consistent with the ability "to excavate nine million cubic yards of heavy clay" was taking place at the time of the application for preliminary injunction. Therefore, while we do not render any opinion on whether the proposed use or action of SJCM constitutes a nonconformity under the ordinance, we do find that SJCM failed to meet its burden to prove that the preliminary injunction as issued would be necessary to maintain the status quo between the parties. Accordingly, we find that the trial court abused its discretion in issuing the preliminary injunction in this case and we reverse the trial court's April 7, 2021 judgment.

**<u>REVERSED</u>**

YOLANDE SCHEXNAYDER & SON, INC.

VERSUS

PARISH OF ST. JAMES

NO. 21-CA-416

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

## JOHNSON, J., CONCURS WITH REASONS

I, respectfully, concur with the majority opinion and the reversal of the trial court judgment in this matter. I agree with the majority opinion, insofar it finds that the trial court abused its discretion in issuing the preliminary injunction based upon the testimony and evidence presented at trial. I write separately to express my view on whether St. James Construction Materials, LLC proved any irreparable injury or loss.

In its request for preliminary injunction, St. James Construction Materials, LLC (hereinafter referred to as "SJCM"), sought allowance of reasonable continued use and operation of the property (hereinafter referred to as "Big Shake") as a commercial borrow pit consistent with its past use and operation, namely, excavation of 9 million cubic yards of clay material to support flood protection levee projects using backhoes, bulldozers/graders, dragline/excavators, and other tracked or wheeled vehicles, including scales and a trailer, without the necessity of St. James Parish Council's (hereinafter referred to as "the Parish") approval, to prevent immediate and irreparable harm to SJCM pending a final decision on the merits. SJCM contended that use of Big Shake as a borrow pit for supply of clay for the U.S. Army Corps of Engineers' projects qualified as a nonconformity as of the effective date of the Ordinance. It further contended that Big Shake continues to qualify for the nonconforming use as a borrow pit because it has continued operations, without any interrupting period of six months or

longer, and had no intent to ever abandon or cease use of the nonconforming use. SJCM maintained that, under the mandatory provisions of the Ordinance relating to nonconformities, reconnection of the electric and water utilities and installation of scales were not "new use" activities subject to the Parish's discretionary approval.

SJCM argued that upholding the Parish's position pending trial would cause irreparable harm because it would prevent the U.S. Army Corps of Engineers' approval of Big Shake as a clay borrow source on the West Lakeshore Lake Pontchartrain Levee Project or result in revocation of the approval; irreparably damage the reputation of Big Shake developed over the last decade as a commercial clay source for large industrial and public projects; and, destroy the competitive advantage Big Shake enjoys due to its proximity to the West Lakeshore Lake Pontchartrain Levee Project sites.

The trial court granted SJCM's preliminary injunction request and enjoined the Parish from requiring prior approval as a precondition to SJCM's use of the entirety of the 371-acre property as a borrow pit to excavate, sell, and deliver up to 9 million cubic yards of clay material for U.S. Army Corps of Engineers levee projects. The court also enjoined the Parish from requiring prior approval for the use of any necessary utilities or equipment, including electrical or water services, in connection with the nonconforming use, which would prevent such use, *e.g.*, refusing to issue permits for the utilities. Thus, the question before this Court is whether the trial court was manifestly erroneous in the issuance of preliminary injunction in question.

An injunction shall issue in cases where irreparable injury, loss, or damage may otherwise result to the applicant, or in other cases specifically provided by law. *Richard v. Bourgeois*, 19-494 (La. App. 5 Cir. 3/18/20); 293 So.3d 790, 793. An injunction is a harsh, drastic, and extraordinary remedy, and should only issue

where the mover is threatened with irreparable loss or injury without an adequate remedy at law. *Id.* "Irreparable injury" means the moving party cannot be adequately compensated in money damages for his injury or suffers injuries, which cannot be measured by pecuniary standards. *Zeringue v. St. James Parish School Bd.*, 13-444 (La. App. 5 Cir. 11/19/13); 130 So.3d 356, 359.

After reviewing SJCM's arguments, I summarize its position as follows: if it is required to undergo the pre-approval process set forth in the Ordinance by the Parish, it will miss the opportunity and its edge to obtain a contract with the U.S. Army Corps of Engineers for the West Lakeshore Lake Pontchartrain Levee Project, and sustain damage to its reputation as a result of this loss. The alleged losses can be measured by pecuniary standards.[9] Therefore, SJCM failed to prove irreparable loss or injury without an adequate remedy.

For the foregoing reasons, I opine that the trial court erroneously granted SJCM a preliminary injunction against the Parish. In addition to the majority opinion's finding that the actions enjoined within the preliminary injunction do not maintain the *status quo* between the parties, I find that SJCM failed to prove any irreparable injury or loss. On those two findings, I agree that the trial court's judgment should be reversed. However, I do not agree with analyzing subsections (f) and (k) of the Ordinance. As mentioned in the majority opinion, the record before us lacks any evidence to show that SJCM sought any permit approval from the Parish for any use of the property at issue. Because the Parish has not yet had an opportunity to render a zoning decision in this matter for us to review, I find

---

[9] "Loss of business income or profits is a type of special damages." *Breton Sound Oyster Company, LLC v. Stiel Insurance Co. of New Orleans, Inc.*, 17-955 (La. App. 4 Cir. 12/12/18); 299 So.3d 80, 89 n. 6, *quoting, Nick Farone Music Ministry v. City of Bastrop*, 50,066 (La. App. 2 Cir. 9/30/15); 179 So.3d 629, 631. Additionally, loss of business reputation is compensable through the award of damages; therefore, it is not a harm properly addressed through injunctive relief. *Two Canal St. Inv'rs, Inc. v. New Orleans Bldg. Corp.*, 15-924 (La. App. 4 Cir. 4/20/16); 193 So.3d 278, 287-88, citing *Ellis Const. Inc. v. Vieux Carre Resort Properties, L.L.C.*, 05-1109 (La. App. 4 Cir. 6/7/06); 934 So.2d 206, 213.

that the analyses and determinations regarding the applicability subsections (f) and (k) of the Ordinance are improper at this juncture.

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

NANCY F. VEGA
CHIEF DEPUTY CLERK

SUSAN S. BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## <u>NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY</u>

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY <u>**MARCH 9, 2022**</u> TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

# 21-CA-416

## <u>E-NOTIFIED</u>
23RD JUDICIAL DISTRICT COURT (CLERK)
HONORABLE ALVIN TURNER, JR. (DISTRICT JUDGE)
ANDREW A. LEMMON (APPELLEE)          VICTOR J. FRANCKIEWICZ, JR.          PATRICK T. ISACKS (APPELLEE)
ROBERT J. STEFANI, JR. (APPELLEE)          (APPELLANT)

## <u>MAILED</u>
W. PETER CONNICK, JR. (APPELLANT)          SCOTT FALGOUST (APPELLEE)
ATTORNEY AT LAW                                          ATTORNEY AT LAW
201 ST. CHARLES AVENUE                              LEMMON LAW FIRM, LLC
SUITE 2700                                                      15058 RIVER ROAD
NEW ORLEANS, LA 70170                              HAHNVILLE, LA 70057